1             IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF FLORIDA

3                  PENSACOLA DIVISION

4

5    CASE NO.: 3:23-cv-24717-MCR-HTC

6

7    LOGAN DEMBOSKE,

8            Plaintiff,

9        v.

10   AUTRY GREER & SONS, INC.,

11           Defendant.

12

13

14                  DEPOSITION OF

15                  DAVID COLLETTE

16                  9 MAY 2024

17                  9:00 A.M.

18

19

20          S T I P U L A T I O N S

21           IT IS STIPULATED AND AGREED by and between

22   the parties, through their respective counsel, that

23   the deposition of DAVID COLLETTE, may be taken, via

24   Zoom, before DONNA E. HENDERSON, CSR, Commissioner,

25   on the 9th day of May 2024.

**Exhibit 1**

1          IT IS FURTHER STIPULATED AND AGREED that

2     the signature to and the reading of the deposition

3     by the witness is not waived, the deposition to have

4     the same force and effect as if full compliance had

5     been had with all laws and rules of Court relating

6     to the taking of depositions.

7          IT IS FURTHER STIPULATED AND AGREED that

8     it shall not be necessary for any objections to be

9     made by counsel to any questions except as to form

10    or leading questions, and that counsel for the

11    parties may make objections and assign grounds at

12    the time of the trial or at the time said is offered

13    in evidence or prior thereto.

14          IT IS FURTHER STIPULATED AND AGREED that

15    the notice of filing of the deposition by the

16    Commissioner is waived.

17

18

19

20

21

22

23

24

25

Page 3

1                          INDEX

2    EXAMINATION BY:                        PAGE NUMBER

3    Mr. Stevens      . . . . . . . . . . . .      5

4    Ms. Childs       . . . . . . . . . . . .

5

6

7

8    No Exhibits.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    A P P E A R A N C E S

2

3            MORGAN & MORGAN, by Ms. Evin D. Childs,

4    220 West Garden Street, 9th Floor, Pensacola,

5    Florida 32502, appearing remotely via Zoom on behalf

6    of the Plaintiff, LOGAN DEMBOSKE.

7

8            STARNES DAVIS FLORIE, LLP, by Mr. SCOTT D.

9    STEVENS, Florida Bar No.: 57470, 11 North. Water

10   Street, Suite 20290, Mobile, Alabama 36602,

11   appearing remotely via Zoom on behalf of the

12   Defendant, AUTRY GREER & SONS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, DONNA E. HENDERSON, CSR, a Court

2     Reporter of Mobile, Alabama, acting as Commissioner,

3     certify that on this date, as provided by the

4     Federal Rules of Civil Procedure and the foregoing

5     stipulation of counsel, there came before me

6     remotely via Zoom, beginning at 9:00 a.m., DAVID

7     COLLETTE, witness in the above cause, for oral

8     examination, whereupon the following proceedings

9     were had:

10

11               DAVID COLLETTE,

12     the witness, having been first duly sworn by the

13     Court Reporter, was examined and testified as

14     follows:

15

16          THE COURT REPORTER:  Usual stipulations?

17          MR. STEVENS:  That's fine with me.

18

19               EXAMINATION

20     BY MR. STEVENS:

21       Q    Mr. Collette, when were you first

22     contacted by plaintiff's counsel to review this

23     matter?

24       A    I don't have my case notes in front of me

25     but the, uh, opinion date of, uh, what is it,

Page 6

1   24/01/19, normally I use that -- that sequence of

2   year, month, day as when I consider being retained.

3   I'm not sure if there were days before that date.

4   But my case notes, which I haven't copied over to

5   have access to have the -- a log of communications.

6   But basically January 24, by then I would consider

7   myself retained and contacted.

8          Q     Okay.  So you believe that -- best you can

9   tell you were first contacted in January of 2024?

10         A     So relatively end of like November or

11  December, like, if I have that date for the --

12  the -- that's normally my -- my case number I attach

13  to the invoice.  So it's going to be November,

14  December, early January, but I do have, in my case

15  notes I have a better number.

16         Q     And you didn't bring those with you today?

17         A     No, I did not.

18         Q     But you can get that information for us?

19         A     Yes.

20         Q     When you were contacted were you made

21  aware that the case was pending in Federal Court in

22  Pensacola?

23         A     Yes, I think so just because of the report

24  format.

25         Q     Were you informed at the time that expert

Page 7

1    disclosures, including your own report, were due on
2    February 29th, 2024?
3        A    I don't recall.  I don't normally -- I
4    mean, I just normally when I'm working for an
5    attorney to just tell me they need something by a
6    date, I don't really pay attention to what's causing
7    the delivery date.
8        Q    When did you first learn of the deadline
9    of February 29th, 2024?
10       A    I don't even know if I knew there was a
11   deadline.
12       Q    So as best you can recall you were never
13   even told that there was a deadline; is that
14   correct?
15       A    Um, I -- I don't know.  I can't say I was
16   or wasn't, like -- I just know that in my case
17   notes, I may have a note saying there is a deadline.
18   But, normally, I just, you know, get told, hey, we
19   need a report by a day, and I just deliver.  So I
20   don't really, um, investigate what's causing the --
21   the date, so I don't know.  I just don't remember.
22       Q    Do you recall being told they needed a
23   report by a certain date?
24       A    No, but I don't, like I -- I have to look
25   in the case notes.  But I -- Like I said, I don't

1    remember what caused the report date.  Normally, the

2    day I deliver a report is the day I use.  So, you

3    know, if I write something, making this up, three

4    weeks ago today, and then I mess around with it and

5    I deliver it today, I'll put the day I send it.  So

6    the day I sent it, um, was the -- the date of the

7    report, but I don't have any recollection of

8    specific delivery date driving anything.

9         Q    Are there any E-mail communications

10   between you and Plaintiff's counsel that would have

11   set forth the date that the report was due?

12        A    I don't keep my E-mails.  I -- I actually

13   if I find -- if I have like, uh, you know,

14   instructions, or notes, or information, or I'm

15   talking to somebody, I have a software, I take

16   notes.  I am -- I get a lot of E-mails and I lose

17   them, so I try to take the content that's important

18   and put it into a -- my notes.  So I don't even know

19   if I would record that.  Uh, I don't actually think

20   I would.  Like it wouldn't -- The only thing I would

21   say is need a report by this date, um, might be in

22   my notes.  But, I -- I wouldn't record because of

23   like document date, like the legal system, I just go

24   I need to get a report done by this date.

25        Q    I mean, in this case you did not know you

Page 9

```
 1   needed a report to be done by February 29th of 2024,
 2   correct?
 3        A    I don't remember.  Like I just -- it's --
 4   it's -- Nothing's sticking out going I needed to
 5   deliver by a certain date.
 6        Q    In any event you did not have your report
 7   together by February 29th, 2024, correct?
 8        A    Well, whatever the date is of the report,
 9   um, that's the day I -- So April 26, that's the day
10   I delivered it.  So I -- I would say I didn't have
11   my report done until April 26.
12        Q    And why did you not have it done until
13   then, if the deadline was February 29th?
14        A    Like I said, I don't recall any particular
15   deadline being given to me.
16        Q    Did you have any discussions with
17   Plaintiff's counsel after the original deadline
18   expired on February 29th, as to what additional
19   information you may need to complete a report?
20        A    I would have to see my case notes.  I -- I
21   do remember getting some video after the fact.  I
22   had asked and -- for clarification on policies and
23   procedures.  But, I, again, in my case notes, it's
24   kind of a time flow in there.  I don't -- I don't
25   have a specific activities communications log
```

1   sitting right here with me right now after the date

2   you're referencing versus my report date.

3        Q    All right.  And we asked you to bring a

4   complete copy of your file, it sounds like you don't

5   have that today; is that correct?

6        A    I do not.

7        Q    When did you first inform Plaintiff's

8   counsel that you needed surveillance video -- Or

9   strike that.

10            Let me ask you this:  Did you inform

11   Plaintiff's counsel that you needed surveillance

12   video in order to prepare your report?

13        A    I don't think I ever, uh, say I need

14   surveillance video.  I ask for, you know, materials,

15   specification information, policies/procedures, are

16   there any videos, and, you know, the complaint,

17   discovery stuff, the -- like if there's an incident

18   report.  So I just have a list of things I'm asking

19   for, so I don't know if I had a date where I

20   specifically said, hey, I -- because I don't think I

21   ever say I need this, it's more of wants, because a

22   lot of times, there are no security videos in a lot

23   of incidents -- locations.

24        Q    Yeah.  So it's fair to say in order to

25   prepare your report and to come up with your

1    opinions in this particular case, you didn't

2    actually need the surveillance video, did you?

3         A    It helped a lot actually, um, it's --

4    because the -- the description of the incident from

5    the complaint is like not very in depth.  The, uh --

6    The phone -- I had the phone interview with

7    Mr. Demboske and, I guess, an insurance person, or

8    something.  But the -- the security video helps

9    because it kind of -- without having policies and

10   procedures, it helps me understand the -- the

11   timeframe before the incident to the incident of

12   like what literally happened on the aisle at the

13   location.

14        Q    Prior to February 2024 -- Well, strike

15   that, I'm going to go back.

16             Prior to February 29th of 2024, did you

17   ever tell Plaintiff's counsel that you needed the

18   security video in order to prepare your report?

19        A    I don't remember.  Like I said, I don't,

20   uh -- Need to me means shall.  I -- I mean, I always

21   ask for it.  And the -- I don't remember the

22   timeframe of -- of the dates, I'd have to look at my

23   notes to see if I even took a note of that.  I know

24   there was discussion of getting security video,

25   and -- and I don't remember the timeframe because I

1    got one set of security video was just the incident

2    and then I got a longer security video that has more

3    before and after and I just don't remember the dates

4    of those.

5         Q    I believe you mentioned that there are

6    times, many times, when you prepare reports of this

7    nature without a security video; is that right?

8         A    Yes.

9         Q    All right.  And so in order to actually

10   prepare your report, it's not crucial, it's helpful,

11   but it's not crucial to preparing your report,

12   correct?

13        A    Well, it -- it's -- there's a part of the

14   ASTM F2948 is a standard around all cases considered

15   a walkway auditor.  And in there, there's a

16   reference to an ASTM standard about how to do

17   incident/accident investigations.  There's a list of

18   stuff that could be considered.  Because, I mean, as

19   you can imagine, a slip and fall in a grocery store

20   is different than falling down the stairs of an

21   apartment building exterior walkway.  So the -- the

22   items that may be considered are different.

23             I always ask in retail environments, uh,

24   if there is video and -- and, you know, if there

25   isn't, um, you know, it's -- I have to consider what

1    I -- the information I'm being given.  With video,

2    it's -- it's really very nice because I can see the

3    incident.  I can see the -- like what happened to

4    the person.  I can see the -- the operation of the

5    facility prior to the incident.  So it's a long way

6    of saying I don't need it.  But in this case, when I

7    have it, it provides useful information in my

8    analysis.

9        Q    I believe you said that there's typically

10   a list of things that you want in order to prepare a

11   report of this nature, what things are on that list?

12       A    Well, it depends on what's the information

13   I have been given.  In this case, when I first got

14   it -- discussed the needs with this thing, I didn't

15   really have any information, because the -- I

16   hundred percent know I asked for policies and

17   procedures, the -- related to the operation.  I also

18   asked for the floor maintenance policy, the material

19   that was used on the floor, I have never been given

20   any of that.

21            So the -- And then I was informed there

22   was a video, I just don't remember what date I was

23   told there was a video.  So it -- that is -- You

24   know, as soon as I was told there was a video, I

25   said I definitely want to see that video.  I still

Page 14

1    want to see the policies and procedures, and

2    training manuals, and -- and stuff.  But and -- And

3    what the floor material was, but I delivered my

4    report before I got that.

5        Q    Yeah.  And so with regard to the policies

6    and procedures, I don't think you said you were

7    certain you asked for those, when did you ask for

8    those?

9        A    That I would have to go back to my notes

10   because, um -- Right off the bat, if -- if I didn't

11   ask right away, it was like within days.  Once I

12   understand -- because I have to understand what the

13   incident is, and then I'll ask for literally any

14   legal stuff you guys have given each other around

15   discovery and -- and literally the complaint, so I

16   understand the date and time and location.  And then

17   in a retail environment, I'm always asking for the

18   material, operations procedures, policies, any logs

19   and -- in retail environments, videos to understand

20   what happened in the incident location.

21       Q    And you ask for all that stuff on the

22   front end typically?

23       A    Yes.

24       Q    Go ahead.

25       A    Yeah, when I'm developing an opinion, it's

1  hard to develop an opinion without having any

2  information.

3      Q    And you did that in this case, you asked

4  for that information soon after being retained,

5  correct?

6      A    Yes.

7      Q    And is that true of the video as well?

8      A    The video, I don't -- I always ask, I

9  don't remember if I particularly -- I mean more

10  likely than not, yeah, because most -- most retail

11  environments have security cameras.

12      Q    All right.  What about sworn testimony

13  from the corporate representative of my client, did

14  you ever tell Plaintiff's counsel that you needed

15  that before you could prepare a report?

16      A    Well, uh, it -- it's just harder to

17  prepare a report without understanding policies and

18  procedures and training and materials.  So it --

19  it's -- it's -- If I have to end up preparing a

20  report, like, again, I don't -- I still have no idea

21  what the floor finish is in there.  And -- And, you

22  know, if they're -- I understand now that there are

23  no official published documents.  But that the --

24  that testimony helped with that because then I

25  didn't have -- there was no documentation to get, so

1    that helped me understand the incident better.

2         Q    Well, respectfully that wasn't my

3    question.

4              My question was:  Did you ask Plaintiff's

5    counsel or tell her that you needed the deposition

6    of the corporate representative of my client before

7    you could prepare your report?

8         A    I don't remember.  I normally, uh, have

9    the -- You know, I'm given information, I ask for

10   stuff, but I -- I'm pretty sure I've never told an

11   attorney I've worked for that I need them to do

12   something other than provide me information.  So,

13   I'm pretty sure I've never directed anybody to do a

14   corporate rep dep.

15        Q    Okay.  And you didn't do that in this case

16   to your recollection, correct?

17        A    I know I did not.

18        Q    All right.  If a video is helpful to you

19   in understanding an accident, do you agree it's

20   important that you seek that out early, well in

21   advance before your report becomes due?

22        A    Well, I always like to get full

23   information before -- before a report becomes due.

24   But, uh, unfortunately, sometimes I just don't get

25   all the information that I would like to get and

Page 17

1    then I have to develop an opinion based on the

2    information I have.  And I -- I won't -- I mean, in

3    developing an opinion, I'm -- I'm definitely looking

4    for facts and data, so the -- having a video of the

5    incident is best received before my opinion.  But I

6    always have in my opinion, and this one too, that,

7    you know, I reserve the right to modify my opinion

8    based on the data I get.

9         Q    And so in this case even though you knew

10   the video was important, you didn't seek that video

11   out before your report was due, did you?

12        A    Well, I am -- oh, so -- So, I don't

13   understand the question.

14        Q    Well, I'm just saying you testify a lot as

15   a purported expert witness, correct?

16        A    Yes.

17        Q    And you've had a bunch of cases with

18   Morgan & Morgan firm, correct?

19        A    Yes.

20        Q    And in the process of doing that, you

21   understand that when you are in Federal Court there

22   are deadlines that you have to comply with, correct?

23        A    Yes.

24        Q    With regard to expert disclosures, right?

25        A    Yes.

1      Q    And you've prepared many reports for

2    Federal Court cases, haven't you?

3      A    I do -- maybe less than ten, but

4    definitely less than twenty.

5      Q    Okay.  But you understand, like I said, in

6    Federal Court you've got very hard deadlines that

7    are in place for when your opinions have to be

8    provided to the other side, correct?

9      A    Mostly, my -- my deliverables and timings

10   are driven by the -- the organization I'm working

11   for.  I don't -- I don't -- Unless I get told a

12   certain date or am -- or I'll put it this way, I get

13   forced to deliver on a certain date because it's a

14   hard deadline, I just do what I do.  So in this

15   case, I -- I delivered my opinion on the day I

16   delivered my opinion based on how I developed and

17   wrote my opinion.

18     Q    Did you deliver your opinion on the day

19   that it was requested by Morgan & Morgan?

20     A    See, I don't -- I don't recall the -- the

21   date it was requested by, all I know is the date I

22   delivered it on.

23     Q    Is it your view that deadlines or reports

24   of this nature can simply be disregarded in Federal

25   Court?

1     A    I'm not sure what you're asking me.

2     Q    I'm just saying is it your view that it's

3  not important to meet the deadlines in Federal Court

4  for when disclosures are supposed to be provided?

5     A    I don't have an opinion on that.  As I

6  mentioned, um, if I'm engaged and I get a hard

7  deadline, I'll meet it.  And -- And in this case the

8  date I delivered the opinion is the date on the

9  opinion.

10     Q    And you were never given a hard deadline

11  other than that, correct?

12     A    I'd have to look at my case notes, I --

13  Sitting here, I don't know.

14     Q    Okay.  How easy is it for you to get your

15  case notes?

16     A    Not very easy today because I have to go

17  to the airport in an hour and a half and it's on a

18  different system.

19     Q    Okay.  You inspected the store on

20  February 5th of 2024; is that right?

21     A    I have the pdf of the opinion up on my

22  laptop, and yes.

23     Q    All right.  And so that was 24 days before

24  the expert deadline in Federal Court, assuming the

25  deadline was February 29th, correct?

1      A    Uh, yes.

2      Q    And at the time from your inspection on

3  February 5th, until that deadline on February 29th,

4  you never told Plaintiff's counsel you needed to see

5  the store video or that you needed testimony from a

6  corporate representative, correct?

7      A    Uh, I don't recall ever demanding that.

8  I -- I would have to see my case notes because I

9  normally don't have that information to give to

10  the -- an attorney, I am normally told that

11  information and when it may be coming.

12      Q    With regard to the information related to

13  the policies and procedures, those things can be

14  obtained through request for production in Federal

15  Court; are you familiar with that?

16      A    I -- I try not to play attorney.  I just

17  ask for information related to the incident and, um,

18  and provided it, but I am not part of the process of

19  the legal system.  So I know you guys can ask each

20  other for stuff, but I don't -- I don't get involved

21  in that process.

22      Q    Okay, fair enough.  How many times did you

23  speak with Plaintiff's counsel regarding this

24  matter?

25      A    You'd have to look at the case notes.

1    I -- I have no idea.  I don't have any idea, like

2    more than five, less than fifty, I mean, I'm making

3    a number up there.  It's a -- It's a -- I just don't

4    know.  I would have to go look at the case notes to

5    see, uh, the communication flow on inspection setups

6    and -- and from my perspective, what I'm calling

7    data requests, like, hey, can I get this information

8    to develop the opinion, so I don't have a specific

9    number.

10        Q    So would you put in your case notes every

11   time that you have a conversation with Plaintiff's

12   counsel?

13        A    Anytime there's something that I would

14   call, uh, like useful, like, uh -- like if I get

15   told, hey, we got to change the inspection from six

16   o'clock to seven o'clock, I won't record that, I'll

17   just change the inspection time, so I don't have an

18   exact log of interactions.

19        Q    Okay.  Do you recall having a conversation

20   with Plaintiff's counsel on February 27th?

21        A    I don't have any idea sitting here.

22        Q    All right.  And we can get into this

23   later, but I'm going to -- I'm going to reserve the

24   right to re-depose you, because these are --

25   information that is very crucial and key to your

Page 22

```
 1   testimony and some of the issues are before The
 2   Court, and you have not brought your case file,
 3   which it sounds like it's very important for
 4   purposes of your testimony.  So I'm going to reserve
 5   that right on the record, but I'll still try to go
 6   ahead and go through some of what is in your report.
 7            On Page 2 -- Well, let me ask you this:
 8   Do you have your report in front of you?
 9        A    Yes.
10        Q    All right.  On Page 2 you say, quote, as
11   Demboske took a step on the vinyl floor, which was
12   coated with floor finish, he stepped into a liquid
13   contaminant, slipped, fell, and sustained injury.
14   What do you mean it was coated with floor finish?
15        A    Well, as a -- a product manager at SC
16   Johnson, we actually coated Walmart, Walgreens and
17   Target's floor finish.  I'm very familiar with
18   retail -- those retail floor finish.  I'm on the
19   floor finish standards committee, uh, I am actually
20   on the standards committee for the -- the standards
21   that you use to measure the coefficient of friction
22   of floor finish.  That floor is coated with floor
23   finish.
24        Q    And do you know what finish it's coated
25   with?
```

Page 23

1          A     No, I was provided with no information on

2     that.

3          Q     Do you think it would have been helpful to

4     you in evaluating this matter to have that

5     information?

6          A     In this particular case, no, it doesn't

7     really make a difference.

8          Q     Why doesn't it make a difference?

9          A     Because the ASTM D2047, methods for

10    measuring coefficient of friction of floor finish is

11    a dry static coefficient of friction test method,

12    which specifically says, it's a dry test method and

13    any floor with water on it -- or floor finish with

14    water on it is not to be considered slip resistant.

15    So the standard I used, uh, which was the 8326.3

16    dynamic coefficient of friction used to specify all

17    the porcelain and ceramic tile manufactured and put

18    into commercial facilities in the United States.

19          Also I have the value -- it also

20    specifically says standing water on a walkway

21    eliminates any of the -- the value of measuring

22    coefficient of friction.  So, uh, Demboske, in his

23    testimony said that there was water on the floor and

24    when he slipped, so the -- Regardless of it being --

25    and DCT, by the way, the manufacturer specifies you

1   should put floor finish on top to protect the

2   surface.  And, um -- And unrelated to this incident

3   that, they have done a great job of keeping their

4   floor finish, very shiny floors, it's a great --

5   great job on the floor finish.  But, water on a

6   floor finish is a known hazard, so I don't really

7   need to know what kind of floor finish it is because

8   of the standing water on the floor.

9       Q    Okay.  And what do you -- when you say

10  standing water, what do you mean by that?

11      A    Uh, so the -- if there's -- Actually, I'll

12  call it a puddle, rather than drops, what happens on

13  floor finish is that you get especially -- and it

14  was part of my inspection, there's two components to

15  a slip hazard on floor finish.  One is the

16  coefficient of friction, which I measured, and it's

17  absolutely reasonable dry meets the standards that

18  I'm a standard member of, but the problem is it's

19  very smooth and water on a floor, especially on

20  floor finish, because it's smooth, you basically

21  hydroplane like a car tire.

22           It's one of the reasons, even though --

23  like flip-flops and Crocs are seen as potentially

24  hazardous shoes, it's totally reasonably foreseeable

25  in Florida, that the problem is there's no tread on

1    the bottom of them, so literally like a bald car --

2    car tire, yeah, you hydroplane.  So I don't need to

3    know what the floor finish is.  I'm a hundred

4    percent sure that is floor finish, but because it's

5    so smooth with standing water on it, you -- you

6    hydroplane on it and, um, that's what I meant by

7    standing water, like a -- I'll call it a puddle.

8    There's -- There's no dimensional values for a

9    puddle, it's, uh -- it's just not -- It's the word

10   we use, standing water.

11       Q    And so let me ask you this:  What about

12   droplets, would droplets be considered standing

13   water?

14       A    And that's actually one of the reasons I

15   asked for this spill cleanup policy information

16   because -- because droplets normally don't cause you

17   to slip because the -- like, as an example, a

18   quarter-size droplet normally is much smaller than a

19   person's foot, so it -- it gets squished out

20   underneath the foot, but the rest of the foot is on

21   the floor finish, so it stays dry.  So the, uh,

22   droplets, you know, if -- if you get to the point of

23   having a lot of it can turn into a puddle.

24            But in this case, um, the -- the

25   description from Demboske was -- didn't sound like

1    puddles -- I'm sorry, droplets -- and then after the

2    incident, when he got out a piece of cardboard and

3    started shuffling water around, it -- it in my

4    opinion was not droplets.

5         Q    Did you review his deposition?

6         A    Yes.

7         Q    Did you see where he testified in his

8    deposition that it was droplets?

9         A    I would have to go back to my case notes

10   because the -- the -- again, droplets is -- he, uh,

11   in his deposition never got asked, as far as I can

12   recall, if he said droplets, how big a droplet was.

13   Again, it's -- as I mentioned a quarter-size droplet

14   versus a hundred quarter-size droplets is a

15   different thing.  So a droplet, I would not consider

16   a hazard, more likely than not.  But, droplets, yes,

17   because you can slide from droplet to droplet.

18        Q    Okay.  And would it be important to you to

19   know the size of the droplets, if there were

20   droplets?

21        A    Well, not in this case, no.

22        Q    Why not?

23        A    Because he slipped.

24        Q    Okay.  Did you ever ask for any

25   information on the floor finish?

```
 1        A    Yes.
 2        Q    Did you receive that information?
 3        A    No.
 4        Q    Why did you ask for that information if
 5   you didn't think it would be helpful to your
 6   analysis?
 7        A    Because it's a walkway, and I would like
 8   to understand the technical characteristics of the
 9   walkway.
10        Q    And because you don't know what type of
11   floor finish it was, I assume you didn't evaluate
12   any fact sheets or material data or any other
13   information with regard to that particular finish,
14   correct?
15        A    No.
16        Q    Do you know if the floor was coated with
17   the same finish on the date of the accident versus
18   the date that you did your inspection, approximately
19   a year after the accident?
20        A    No.
21        Q    I'm going to look at Page 4 of your
22   opinion and on Page 4 of your report, there are
23   two-numbered opinions stated there, they're numbered
24   1 and 2, are those the extent of your opinions in
25   this case?
```

1       A    Sitting here, yes.  But, of course, I

2   always reserve the right to modify, if I learn more

3   stuff, but as -- as of today, these are the extent

4   of my opinions.

5       Q    Let's talk about the first opinion.  And

6   the first opinion really seems to have two parts,

7   the first part is that the walkway was a dangerous

8   condition.  In that respect why do you contend the

9   walkway was dangerous?

10      A    Well, it -- the -- the second paragraph

11  explains that.

12      Q    Okay.  So in your view, the second opinion

13  is really an explanation of what is contained in the

14  first opinion?

15      A    Yes.

16      Q    Okay.  You don't know what this floor was

17  made out of, do you?

18      A    The coating or the substrate?

19      Q    The substrate.

20      A    It's vinyl composition tile.

21      Q    All right.  Do you know the specific

22  composition of it?

23      A    Uh, no.  And, again, it doesn't make a --

24  it doesn't affect my opinion because it's covered by

25  floor finish, so you are not actually walking on the

Page 29

```
 1    VCT.
 2         Q    And you don't know the brand or the
 3    manufacturer of that particular tile, do you?
 4         A    No.
 5         Q    And you haven't reviewed any data sheets
 6    or any application matrix, or anything like that
 7    with regard to this particular tile, correct?
 8         A    No.
 9         Q    Would it be helpful to you to know that
10    information?
11         A    No.
12         Q    Did you ever ask for any of that
13    information?
14         A    Uh, I might -- I might have asked for the
15    VCT, but, again, because it's covered with floor
16    finish, the -- the critical item is the floor finish
17    spec information and not the VCT.
18         Q    But, if you have -- Who would you have
19    asked for that?
20         A    Uh, Morgan & Morgan, either Evin or her
21    assistants.
22         Q    You indicated in your report that from
23    your experience in specifying and maintaining floor
24    finishes, including retail stores, including
25    Walmart, the flooring was vinyl composition tile
```

Page 30

1    coated with floor finish, correct?

2         A    Yes.

3         Q    Is that the same type of tile that's used

4    in Walmart and other national retail brands?

5         A    Well, traditionally, CVT is a 12-inch by

6    12-inch format.  Walmart has -- Until Walmart

7    recently started stripping out their CVT and floor

8    finish and going to polished concrete to try to save

9    on maintenance costs.  But, the answer is, yes, that

10   is a pretty traditional VCT that Walmart and Target

11   and any other big box retailer has used until

12   recently.

13        Q    And many of those big box retailers still

14   use that same tile, correct?

15        A    Yes.

16        Q    Do you know if the floor finish had been

17   stripped or waxed at all in the approximate year

18   after the date of the accident before you finally

19   conducted your testing in February of 2024?

20        A    I -- I think I asked for the maintenance

21   procedures and log of the floor finish.

22        Q    Do you know the answer to that?

23        A    No.

24        Q    And, obviously, stripping and waxing can

25   affect the slip resistance of the floor surface,

1    right?

2         A     I -- Well, the -- again, it depends on the

3    technique used, but normally what you are literally

4    doing is buffing off the surface or reapplying the

5    actual coating.  So, the -- the surface may change,

6    but in this case because it's a floor finish, the

7    result either the day of the incident or the day of

8    the inspection would be -- the specific coefficient

9    of friction I measured, may be different.  The

10   surface roughness, probably the same.  But, the --

11   The result of water on floor finish is evident in

12   the -- the BDO, which is slips and falls.  So the

13   though the -- the data I measured during the

14   inspection, the coefficient of friction may be

15   different, the -- the water on a floor finish is a

16   hazard and my inspection collected information that

17   may not directly relate to the floor finish on the

18   date of the incident, but water on a floor finish is

19   the hazard.

20        Q     Right.  But no disrespect, that wasn't

21   really my question.

22             My question was:  If you have a floor

23   that's been stripped or waxed, over the course of a

24   year, and you got an accident happened in January of

25   2023 and you come and inspect the floor in February

Page 32

```
 1    of 2024, the stripping and waxing during that
 2    interim can affect the slip resistance of the floor,
 3    correct?
 4         A    Oh, yes, yes.
 5         Q    All right.  And I assume that general wear
 6    and tear can affect that slip resistance as well,
 7    right?
 8         A    Yes.
 9         Q    Well, do you know if you were able to test
10    the precise tile on the floor where his foot slipped
11    that day?
12         A    It doesn't matter because the floor
13    finish, by design, has the same type of surface.  I
14    could have measured three points across that store
15    200 feet apart, and if it's not the same
16    characteristic, uh, either the maintenance
17    procedures are wrong or it's a different floor
18    finish because it's literally liquid plastic that we
19    put down on floors that evaporates to create Saran
20    Wrap on your floor.  And -- And that's -- that's --
21    So it's -- it's the same.
22         Q    So the specific location where he fell
23    doesn't really matter at all to you as long as he
24    fell somewhere within that store, your testimony is
25    essentially going to be the same, correct?
```

1      A    I -- And I won't be as bold to say I

2   didn't need to do an inspection at all once I saw

3   the security video.  But, the -- The water on the

4   floor finish is a hazard.  And the -- My opinion,

5   the inspection was useful because I walked in and

6   could see a floor finish.  I didn't need to do

7   surface roughness and coefficient of friction

8   measurements to develop my opinion after that.  I

9   always do though because data doesn't lie.  But,

10  I -- I could remove my coefficient of friction and

11  surface roughness measurements out of there because

12  water on floor finish is a hazard.

13      Q    Okay.  And so going back to my earlier

14  question, it really wouldn't have mattered where he

15  fell in the store, your opinion would have been the

16  same, correct?

17      A    Well, I mean, it would have mattered if

18  there had been no water on the floor --

19      Q    Sure.

20      A    -- contaminant.  So it's the liquid

21  contaminant on that floor finish, like -- like it

22  could have moved as long as it was that floor

23  finish.

24      Q    Yeah, sure.  And maybe we are talking

25  around each other.  But you knew on the day that you

1    did your inspection that Mr. Demboske claimed there

2    was water on the floor, right?

3         A    Yes.

4         Q    And so it really didn't matter to you

5    where the water was, what particular spot it was at

6    in the store, as long as there was water on that

7    floor, your opinion was going to be the same,

8    correct?

9         A    Well, so -- So, yes -- Yes, and -- it's

10   a -- the test method requires three points.  So I

11   moved the test points away from each other and

12   again, I don't know if I -- I have the test

13   values -- flipping through here for a sec to see if

14   I actually put a table in here.

15             Yeah, I -- I averaged the three locations,

16   but I have the original test data and -- and they're

17   close, so -- So basically what I'm saying is that

18   floor finish has the same surface roughness and

19   coefficient of friction characteristics pretty much

20   across any place water had been properly applied.

21        Q    Okay.  So it didn't matter to you that it

22   was the spot where he fell, your opinion was going

23   to be the same, right?

24        A    Yes.

25        Q    In your report you list two terms, one is

1    dry static coefficient of friction, which, I believe

2    the acronym you used is dry SDOF; is that correct?

3         A    Yes.

4         Q    And then wet dynamic coefficient of

5    friction, and the acronym for that is DCOF, correct?

6         A    Yes.

7         Q    Did you measure the dry static coefficient

8    of friction on the floor?

9         A    No.

10        Q    There is no reason to do that?

11        A    I can't.

12        Q    All right.  What about the wet dynamic

13   coefficient of friction, you measured that, correct?

14        A    Yes.

15        Q    All right.  And you indicated on Page 6 of

16   your report that a reasonable flooring material for

17   a food retail store shall have a DCOF greater or

18   equal to 0.42; is that right?

19        A    Yes.

20        Q    And as measured here, the average DCOF for

21   the three test locations was 0.48, correct?

22        A    Yes.

23        Q    So that tells me that the floor itself, by

24   your own admission, met the applicable standard for

25   what was reasonable with regard to flooring material

Page 36

1    in a food retail restaurant store, right?

2         A    No.

3         Q    Why is that incorrect?

4         A    Because the second part of the opinion is

5    surface roughness, and the -- the dynamic

6    coefficient of friction relates to the adhesion slip

7    and falls.  So the two -- the bottom of the shoe

8    attaching to the top of the -- of the polymer or a

9    tile and sticking.  But, the problem is, and why,

10   uh, floor finish is slippery when wet, is because

11   it's smooth, it -- it -- you hydroplane and dynamic

12   coefficient of friction doesn't measure the -- the

13   hydroplane effect, I guess is the word.  So -- And

14   that's actually one of the problems with floor

15   finish is if you don't keep it dry, it -- it's

16   slippery when wet.

17             And the problem with floor finish is

18   because it's measured with a dry static coefficient

19   of friction test method that uses a leather sensor,

20   and nobody has leather shoes anymore.  It -- it

21   doesn't provide reasonable slip resistance.  And I'm

22   on the standards committee, and we talked about

23   this, is the -- the test methodology requires a dry

24   static coefficient of friction value of .5 or

25   greater for the floor finish to be marketed as slip

Page 37

1    resistant.

2            It specifically says that it's a dry test

3    and that -- which, of course, doesn't evaluate at

4    all its slip resistance in a wet environment.  The

5    test method that I used is the tile standard, and,

6    you know, in a walkway that's kept inside, level,

7    and free of contaminants, and free of standing

8    water, can reasonably be .42.  The problem with this

9    is the -- the water on the floor, and that -- that,

10   uh, eliminates the .42, .48 value, especially when

11   it's smooth, because the -- the -- you hydroplane.

12   So it -- it's -- it's halfway there to be

13   reasonable, but the standing water eliminates the --

14   the -- I'll call it the safety level of the DCOF

15   test and it's showing using the surface roughness

16   that, uh, that it's more likely not that somebody is

17   going to hydroplane on that surface.

18       Q    All right.  But, your report says a

19   reasonable flooring material for a food retail store

20   shall have a DCOF greater or equal to 0.42, right?

21       A    Yes, yeah.

22       Q    And 0.42, that's the standard that's set

23   forth within ANSI; is that correct?

24       A    That is an ANSI A326.3 test, so it's --

25   it's -- oh, there it is.  But, the floor must be

1   maintained and free of standing water or

2   contaminants, so if -- if you put -- install that

3   floor, you have to have it free of standing water.

4   So the -- the water on the floor killed any level of

5   safety.  I mean, it's -- especially in that surface

6   roughness, so it's, uh -- the standard specifically

7   gives you a value, but then you have conditions, and

8   this incident broke one of the main conditions to

9   meet the standard.

10      Q    All right.  Look at Page 6, of your

11  report, if you will, where it talks about A326 --

12      A    Yeah.

13      Q    It says:  A326.3 states that no flooring

14  material should be walked upon wet below a value of

15  .42 DCOF, correct?

16      A    Yes.

17      Q    And here the value was .48, correct?

18      A    Yes.

19      Q    All right.  And so to me that means that

20  the floor met the standard, if you have already set

21  a reasonable standard for flooring material for a

22  food retail store having a DCOF of greater or equal

23  to .42, here we have .48, and then you're also

24  saying that the ANSI standard A326.3, states that no

25  flooring matter shall be walked upon wet below a

1    value of .42 DCOF.  So if we're at .48, why is that

2    not consistent with the ANSI standard?

3         A    So -- So any material below .42 is never

4    used in a commercial environment as a floor, if

5    there's any potential of water being on it.  And

6    this isn't the case, right, so all commercial tile

7    installed is about .42, just for showing up.  This

8    has .48, but there's a caveat in the standard.  So

9    as a material specification, you need about a .42.

10   But, you can't have standing water or an unclean

11   floor.  And in this case, this -- this -- in my

12   opinion, this isn't a contamination of soil slip and

13   fall, this wasn't an oily floor, but this was a

14   standing water floor and in that standard above a

15   .42 in a retail environment is reasonable.  So the

16   point .48 is reasonable, but you can't let standing

17   water sit on it, so there's a -- there's an extra

18   little bit to that.

19        Q    Okay.  And that's why I'm getting at.  I

20   mean, your testimony essentially is that a floor in

21   and of itself, but for the water, is reasonable to

22   have in an establishment of this nature, correct?

23        A    Yes.

24        Q    And many retailers have that same floor

25   nationwide, correct?

1      A    Yes.

2      Q    So if you kind of boil down your opinion,

3  it's really just that it doesn't really matter what

4  the DCOF is, if there's any standing water there

5  then you're going to testify the floor is unsafe and

6  slippery, right?

7      A    In this case, yes, because of the floor

8  finish.

9      Q    And not just like the fact that water on

10  the floor makes it slippery is something that every

11  person knows, right?

12      A    I -- I don't know every person, I work on

13  cases.

14      Q    Well, that's general knowledge that most

15  people are aware of, right, if you've got water on a

16  hard surface, it's going to make it more slippery,

17  correct?

18      A    I -- I'm not trying to twist it.  But, I

19  actually don't know, because the -- if you go to a

20  commercial kitchen, that's a highly soiled

21  environment, we have floors -- When I say we, the

22  industry, we have floors for that environment that

23  are super rough and super high coefficient of

24  friction for that particular use.

25      Q    Well, this isn't a commercial kitchen,

1  right?

2      A    Yeah, so, and I -- but, what I -- what I

3  do find is, especially in Florida, you guys wear a

4  lot of flip-flops and those shoes just don't have

5  treads.  And if you get onto a smooth floor with a

6  shoe without treads, uh, you hydroplane.  I

7  literally have no idea if people know that, like

8  it's a -- it's the -- you know, I don't -- I don't

9  go from the consumer side, I go from the material

10  side up.

11      Q    So you have no idea if the general public

12  believes that water on a hard floor surface will

13  make it more slippery?

14      A    Well, again I'm not trying to be cute, I

15  mean, I just engineer, right, so like I -- I deal

16  with a lot of slip and falls and people end up

17  slipping.  They're -- I'm sure if you ask them after

18  the fact, you know, they'll go, wow, it's slippery.

19  But, the -- A wet concrete sidewalk, I don't think

20  anybody thinks it's more slippery wet.  I think

21  people get surprised when they get to tiles and

22  smooth floors how slippery they are.  But people --

23      Q    The testimony is not that the floor itself

24  was the wrong flooring that was chosen, or was

25  unsafe for any reason, your testimony is that when

Page 42

1   water is applied to the floor, standing water is

2   allowed to stay there, that's when it becomes

3   slippery, correct?

4       A    Yes.

5       Q    And that's what virtually everyone in

6   America knows, correct?

7       A    Well, again, I think you've gone back to

8   the type of floor, like a broom concrete with wet

9   water on it isn't slippery, so like I -- like, I

10  don't know how to answer your question.

11      Q    Well, I guess, what I'm getting at is I

12  don't feel like your testimony is really expert

13  testimony, I mean, you're essentially testifying

14  that whenever you've got water on a tile floor in a

15  grocery store, that most grocery stores in America

16  utilize, that that floor becomes more slippery,

17  don't you think that the average American knows that

18  without an expert telling them that?

19      A    I don't know.  I don't do behavioral

20  stuff, that's not me.  I -- I'm about the material.

21  So, again, uh, yeah -- No, I -- I don't know how to

22  answer your question.

23      Q    Okay.  On Page 6 of your report you said

24  that her standard, regardless of DCOF value,

25  standing water is identified as a pedestrian hazard,

Page 43

1    correct?

2        A    Yes.

3        Q    All right.  And that's what your opinion

4    boils down to, correct, standing water is always a

5    hazard?

6        A    Yes.  You're depending on the material

7    underneath the water.

8        Q    Why, why would it depend on the material

9    underneath the water?  I mean, if the coefficient of

10   friction, the dynamic coeffient of friction, doesn't

11   matter if you've got standing water there, you've

12   already testified it doesn't matter what the DCOF

13   is?

14       A    You are correct.  But it does matter the

15   surface roughness.

16       Q    Well, let's talk about the surface

17   roughness.  You had a reference in your report to

18   what you call RSD value; is that right?

19       A    Correct.

20       Q    And you said below ten is considered a

21   high-slip potential, correct?

22       A    Yes.

23       Q    And here the RSD value was above ten,

24   wasn't it?

25       A    Uh, well, if you continue reading there,

1    the -- a below ten is considered a high-slip

2    potential, a minium of twenty provides a slow-slip

3    potential for clean water.

4         Q    If you have a reasonable dynamic

5    coefficent of friction, is it fair to say the

6    roughness of the surface is not as important?

7         A    Well, I mean, I don't know what reasonable

8    coefficient of friction means.

9         Q    Well, you defined it, you said that .42 is

10   reasonable in the marketplace?

11        A    Let's go -- I don't understand your

12   question.

13        Q    I read it from your report a few minutes

14   ago:  A reasonable flooring material for a food

15   retail store shall have a DCOF greater or equal to

16   0.42, correct?

17        A    Yes.

18        Q    All right.  And so when you are saying you

19   don't know what reasonable is, you've already said

20   that in your report, haven't you?

21        A    Again, it's use dependent, and so your

22   question was kind of a generalized question, so like

23   are you asking specifically about a retail store?

24        Q    I'm just asking in general.  Let me ask

25   you this way:  Have you testified in the past that

1   you have a reason -- if you have a reasonable

2   dynamic coefficient of friction that roughness,

3   surface roughness is not as important?

4        A    No.

5        Q    You have never testified to that?

6        A    Not that I can remember because surface

7   roughness and coefficient of friction work together,

8   you can't --

9        Q    Well, obviously they work together, but if

10  you have a higher DCOF, the surface roughness is

11  less important, correct?

12       A    Well, I -- I -- Again, I can't answer that

13  because they -- they are correlated.  You know, if

14  you have a high DCOF, you can -- you can get a rough

15  surface.  But you can also get -- I mean, polished

16  concrete is a perfect example, it's reasonable, but

17  slippery when wet because it's smooth.  So I -- I --

18  In this case, like, I don't have an opinion on what

19  you're asking me because my opinion is based on

20  floor finish in a retail environment with standing

21  water.

22       Q    Well, is there any standard for RSD value

23  that would be required in a retail grocery store?

24       A    No.

25       Q    Is there any standard out there that says

Page 46

1    the RSD value of this particular floor is

2    inappropriate for retail grocery stores?

3         A    ASTM F3132 is material selection standards

4    and the -- the floor finish standard does not, uh --

5    because it's a static coefficient of friction

6    standard used to measure dry static, so that you can

7    advertise it as slip resistance, doesn't give you,

8    uh, information on its slip resistance when wet.  So

9    we in the floor finish side don't measure the

10   smoothness of the finish because we want it to be

11   very smooth.  So there is no required floor finish

12   smoothness standard measurements -- measurement

13   standard.  Sorry.

14        Q    All right.  I want to turn to the second

15   part of that first opinion in your report.  You

16   indicate the walkway was more likely than not a

17   cause of his incident and injury, you know, you are

18   not a medical expert, right?

19        A    No.

20        Q    You are not qualified to testify about

21   medical causation, correct?

22        A    That is correct.

23        Q    All right.  When you say that with regard

24   to the cause of the accident the walkway was a cause

25   of this accident, I thought that language was

1    interesting, you didn't say it was the only cause,

2    right?

3         A    I don't know that it was the only cause,

4    uh, because my -- my engagement was to look at the

5    incident location, so I'm not a doctor, so I

6    don't -- I don't have any opinions on the biomedical

7    stuff if there are any.

8         Q    Okay, yeah.  And you're not a

9    biomechanical expert, right?

10        A    My background is -- well, from this

11   context, the walkway research and standards

12   integrates human factors, but I am not a -- I am

13   going to give no opinion on to his bone structure,

14   and his gait, or his vision, like that, nothing

15   related to this.

16        Q    Okay.  Sort of getting away from the

17   medical part of this and into the incident itself,

18   you also said it was a cause of the accident -- of

19   the incident, did you consider other potential

20   causes of this incident?

21        A    Well, in my opinion is everything that I

22   considered and evaluated.  I -- I say a cause

23   because there may be other causes, but my particular

24   focus is the material selection meaning this

25   walkway.

1      Q    Did you speak to Mr. Demboske at all in

2    the course of putting together your opinions?

3      A    No.

4      Q    Why not?

5      A    Well, I had the complaints, uh, the video,

6    and his, uh -- his audio transcript with the

7    insurance adjustor or somebody, so I didn't feel I

8    had any need to talk to him directly about the

9    incident because I literally could see his incident.

10     Q    Did you ask him to attend the store

11   inspection with you?

12     A    I did not.

13     Q    Any reason why you didn't?

14     A    Well, again, I had the incident video, uh,

15   and so I understood the location and the -- the

16   audio of his interview, so I understood the basic

17   aisle location, the -- the facts leading up to the

18   incident, so I didn't feel I needed him to attend

19   because I had nothing to ask him.

20     Q    Did you tell me earlier you reviewed his

21   deposition?

22     A    Yes.

23     Q    I don't see that in the list of

24   information you said you considered in your report.

25     A    I'll have to look at my notes because now

Page 49

1    that I think about it, I guess -- like I said, if --

2    I have to look now, because the -- my basis of

3    opinion is listed in the back of this opinion, and

4    I've got to go back and -- and look at my case notes

5    because I may not have -- like I said, I need my

6    case notes.

7         Q    Okay.  As we sit here today, you don't

8    know if you reviewed Mr. Demboske's testimony or

9    not, correct?

10        A    I'm going to say I don't remember because

11   I don't remember.

12        Q    All right.  Are you aware that

13   Mr. Demboske testified that he had three bong tokes

14   of cannabis the morning of the accident?

15        A    I don't remember that.  And, uh, I -- you

16   know, I'm not a medical expert, so if -- if I have

17   notes on his -- his deposition, I don't even know if

18   I would record that.  So I -- No, I don't remember.

19        Q    Do you think that could have contributed

20   to his fall?

21        A    I am not a medical person, pot guy, so I

22   don't have a -- I can't opine.

23        Q    Would you defer to a toxicologist on that?

24        A    I -- I -- Yes, because I have nothing -- I

25   have no opinion about his medical condition.

1       Q    Were you aware that Mr. Demboske testified

2    that he wasn't looking at the floor where he was

3    walking in front of him?

4       A    I don't recall.

5       Q    Assuming he testified to that, do you

6    think that could have contributed to his fall?

7       A    Well, the -- I don't know if I -- in my

8    basis of opinion, I don't think I actually -- Yeah.

9    No, I don't -- I didn't refer to it in this opinion.

10          So research shows that we look about three

11   or four steps ahead of us based on the level of risk

12   we perceive on our walkway.  So if you're climbing

13   up Mount Everest you're looking at every single

14   step.  In a retail environment, uh, people just

15   don't think there will be hazards on the floor so

16   they are looking three to four, on average, steps

17   ahead.  And in a retail environment, you're also in

18   search mode, so you're -- you are shopping.  So I

19   don't find it unusual in a retail environment that

20   the person's not looking where they're walking while

21   they're walking because of the low risk they

22   perceive in a retail store and the fact that they're

23   looking for something that's usually not on the

24   floor.

25       Q    And what do you mean the low risk in a

Page 51

1   retail store?

2        A    Well, like if you were -- think of like

3   increasing risk, like, again, Mount Everest every

4   step or you die.  You know, walking down a riverbed,

5   you know, lots of pebbles, you're going to be

6   looking where you're putting your feet.  If you are

7   on like a dirt path in the forest, but you think

8   it's kind of, like, okay, if it's not going to be

9   trip hazards, you -- you start looking further up.

10  And then on a sidewalk or -- or something that you

11  expect to be used as a pathway, we don't normally

12  look every single step because we don't expect to,

13  you know, interact with something that can cause us

14  to trip or slip.

15       Q    Well, certainly as a walkway auditor

16  though you can agree with me that it would be

17  recommended that someone look forward, in front of

18  them, where they're walking so that they don't slip

19  on something that might be in the floor,

20  particularly a clear substance, right?

21       A    Well, I -- It's one of the reasons I

22  wanted to see the spill cleanup policy because, uh,

23  it's reasonably foreseeable in a retail environment

24  that people aren't going to be looking at every step

25  and that -- that's why spill cleanup and safety

1    sweeps are important in a retail environment.  So

2    that's, uh, the -- the reason maintenance is

3    important and material selection is important.  So

4    the people -- we do look down when we walk.  It's

5    just more likely than not we are looking three to

6    four steps out if we think we are not going to trip

7    or slip on something.

8         Q    But, is it your opinion that Mr. Demboske

9    should not have been looking at the floor where he

10   was walking?

11        A    Oh, no, I didn't say that at all.

12   Absolutely, we look at the floor while we walk.  I

13   just can't, uh, say, you know, should he have looked

14   down the exact step he stepped into this, I -- on

15   average, we look three to four head, we do look down

16   and we do look around, and you should look down and

17   look around.  We -- We do look down and look around,

18   we just don't necessarily look at every single step

19   we're taking.

20        Q    Yeah.  And if you fail to look down and

21   look around where you're walking that can contribute

22   to an accident like this, correct?

23        A    Yes.

24        Q    And if Mr. Demboske testified he was not

25   looking down where he was walking, then your opinion

1    is that contributed to the fall, correct?

2         A    Well, the thing about, uh, testimony about

3    he wasn't looking down where he was walking, and

4    again, the -- we have to look down while we are

5    walking, and -- and that statement is like, he

6    wasn't looking down when he was taking that one

7    step, or he wasn't looking down at all, because we

8    can't walk without looking down.  We do, we just do.

9         Q    And I believe you said you're typically

10   looking three to four steps in front of you as

11   you're walking, correct?

12        A    Yes.

13        Q    My question is this:  If Mr. Demboske

14   testifies he wasn't doing that, then that

15   contributed to this accident, didn't it?

16        A    I -- Yes, I mean, if you never look down

17   while you are walking, but it's highly unlikely

18   because we -- we just don't do that.

19        Q    I want to talk about your second opinion,

20   the Number 2 opinion on Page 4.

21             Well, before we go there, let me ask you

22   this:  You were obviously aware that there was a

23   Coca-Cola vendor in the area just prior to Mr.

24   Demboske's fall?

25        A    Yes.

1      Q    I believe you noted that in your report;

2    is that correct?

3      A    Yes.

4      Q    Do you think that could have contributed

5    to his fall in some way?

6      A    Well, the answer is yes, because -- but, I

7    mean, I can't say with certainty that the liquid

8    came off that pallet jack, but it -- it seemed to be

9    correlated, if not the cause, because it's -- it's

10   right on the spot Mr. Demboske slipped.  So I

11   don't -- I don't have -- In security videos you just

12   can't see liquids and it's on white floor finish,

13   you know, it's why pedestrians can't see water on

14   floors either, steps away.  But there's

15   definitely -- I did not -- I was not provided with,

16   uh, any video before that delivery person entered

17   the aisle, that's why I like to see like an hour

18   before an incident, so I can see what happened in

19   the aisle.  But, uh, it's -- it's -- In that video,

20   it's -- it's -- I can't say it's more likely than

21   not the liquid came off that pallet jack, but it's

22   just interesting that the incident occurred where

23   that pallet jack literally was parked and then

24   moved.  But, I just can't -- I just can't see a

25   hazard in that video coming off that pallet jack.

1      Q    Yeah.  And do you see -- Like, do you
2    recall the Coke employee when he's going to sort of
3    pull away, he kind of peaks his head around and
4    looks almost like he's looking at something behind
5    the pallet jack?
6      A    I did notice that, yes.
7      Q    Yeah.  And so just based on your view of
8    the video, does it seem like the most likely source
9    of this water being on the floor, it came from that
10   pallet jack in some form?
11     A    With -- With the video I was given,
12   it's -- it's, I would say possible, I'm not saying
13   it's more likely than not.  I'm not -- I can't tell,
14   because I can't tell what happened before that.  I
15   mean, it just might have been a coincidence that
16   something got spilled right there and then he pulled
17   on to the spot, but I don't have enough video before
18   it, he shows up, but it's -- it's interesting.
19     Q    Yeah.  I mean, did you see anything else
20   in your view of the video that you felt like would
21   have caused the water to be on the floor, other than
22   that pallet jack?
23     A    Not in the video I was provided.
24     Q    Now I want to move to that second opinion.
25   You indicate that Greer's doesn't have defined and

Page 56

1  published procedures, policies and employee and

2  manager training programs on slip-and-fall hazard

3  identification; do you see that?

4       A    Yes.

5       Q    All right.  Did you actually review the

6  deposition testimony of Greer's corporate

7  representative, Alex Wood?

8       A    The notes, I don't have in front of me,

9  but from memory it basically was there are no

10 published documents.  It's the training is done OJT

11 by managers, I think it's -- it's how it was

12 described.  So I wasn't given any, the three -- I

13 was going to say three main -- several things I'm

14 looking for are published policies and procedures

15 with job descriptions, who the managers are, what

16 the tasks are, training procedures and -- around

17 basic floor maintenance and then a safety sweep and

18 spill cleanup policy.  And I was provided with no

19 documentation that outlined or defined that other

20 than the testimony that we -- that Greer's has an

21 OJT program and that -- that isn't -- You know, I

22 wasn't given any information, so I can't -- I

23 basically have nothing to show that they have a

24 defined program with defined goals and defined

25 hazards training.

1      Q    Well, Ms. Wood talked about that in her

2   deposition, did you not see that testimony?

3      A    Yeah, and unfortunately, I don't have

4   the -- the -- my notes in front of me.  It -- I did

5   remember though it's kind of unusual, I think it's

6   the first time I've ever had an attorney discuss

7   floor maintenance policies and procedures.

8      Q    Yeah.  Well, I mean, I'll say this -- And

9   I don't mean this in a disparaging way at all.  But,

10  there are a number of factual errors in your report

11  with regard to what she testified to versus what you

12  say she testified to.  And so I'm just curious, did

13  you actually review her deposition?

14     A    Yeah, I'd have to pull up my case notes to

15  see what I wrote down about what she said.

16     Q    All right.  As we sit here today, you

17  don't know if you reviewed it or not, correct?

18     A    Well, it's Number 6 on my basis of

19  opinions, so if it's on there, I reviewed it.

20     Q    Do you know how much time you spent

21  reviewing it?

22     A    Not sitting here, no.

23     Q    Would you have made any notes, like on the

24  deposition transcript itself?

25     A    Yes.  Well, what do you mean made notes on

Page 58

1   the transcript; no, I take notes from the

2   transcript.

3        Q    And you still have those, they're

4   somewhere in your file, wherever that is, correct?

5        A    Yeah, they -- they would be part of the

6   deliverable for that notice of deposition request,

7   my case notes.

8        Q    Okay.  I don't believe I have seen that,

9   have you provided that to us?

10       A    No, no, it's not -- no, it's the file I

11  did not bring today.  So I have my case -- I have

12  case notes, I just don't have them sitting here in

13  front of me.

14       Q    Okay.  Do you recall Ms. Wood's testimony

15  that the store cleans the floors multiple times

16  daily and that all employees are instructed to

17  constantly keep a lookout for anything that could be

18  a potential hazard while moving through the store?

19       A    Yeah, I think I probably wrote notes about

20  that, uh, because I'm always -- A policy where

21  everybody's always responsible to look out for every

22  hazard, but -- but can't then explain to me what

23  hazards they're looking for, and what they're

24  supposed to do if they see a hazard isn't a policy.

25  So, it's, uh --

1      Q    Well, they have a policy -- they have a
2   written policy that you were provided with regard to
3   exactly what to do if you see a hazard, don't they?
4      A    If that's not in my basis of opinion -- So
5   the only thing I have is the Defendant's Objections
6   and Answers to Plaintiff's First Set of
7   Interrogatories.
8      Q    Did you review the Greer's Workplace
9   Safety Rules?
10     A    Oh, that OSHA document, yeah, that
11  actually is a workplace safety employee focused
12  document that really has nothing to do with facility
13  maintenance, and slip and fall, and spill-cleanup
14  procedures.
15     Q    Well, it specifically says cleanup leaks
16  and spilled liquid immediately, doesn't it?
17     A    Yeah, but, if I said fill your car with
18  gas, but I don't tell you how to do it, how do you
19  know how to do it?  So there are no seemingly
20  training procedures saying to do something, but
21  without appropriate identification of the process
22  and training and understanding what they're doing
23  doesn't mean anything.
24     Q    Well, but you know how to fill your car
25  with gas, because you've observed other people do

1   it, and you have a parent teach you, or something

2   like that, right?

3        A    Yeah, well, the interesting thing about

4   that is, uh -- you know, I'll just follow your

5   analogy there, if my dad smoked while he was pumping

6   gas, and I started smoking when I'm pumping gas,

7   that doesn't mean it's a very safe way to pump gas,

8   but I still can pump gas.

9             So the -- The OJT principle, from having

10  written these things, uh, and -- and the cleaning

11  processes and spill cleanups, there seems to be no

12  documentations or identification of what a hazard

13  is.  So if I have my father teaching me how to do

14  spill cleanup -- or I should say my -- my shift

15  manager teaching me to do spill cleanup, I don't

16  even know what that shift manager knows about spill

17  cleanup, or the -- Here's a -- here's a perfect

18  example, the -- in the video, the Greer's employee

19  who comes to mop the spill shows up with a mop, no

20  bucket, moves everything around and then walks away,

21  that is not a very good process.

22       Q    Well, that's all completely after the

23  fact, right?

24       A    Well, no, but, um, per -- per, you know,

25  Greer's, we teach people how to do spill cleanup,

1    that's -- I mean, all he did was probably drip water

2    all the way back and forth, like if that's the OJT,

3    that's not a reasonable process.

4         Q    So at any time did anyone testify that

5    that was the OJT?

6         A    Yeah, well, I mean, I -- Like, I don't

7    have any, uh -- there was no documentation or

8    information given other than one phrase in a

9    OSHA-related document, not a policies and procedures

10   employee training document related to spill cleanup.

11   So that is not a reasonable standard of care for

12   spill cleanup, if that's --

13        Q    When you're talking about the OSHA

14   document, what document are you referring to that's

15   an OSHA document?

16        A    Your workplace safety document provided to

17   me.

18        Q    Do you have that in front of you?

19        A    I do not, no.

20        Q    You didn't bring that with you either?

21        A    No.

22        Q    You said in your report that Ms. Wood

23   testified there are no policies and procedures for

24   keeping the premises safe from slip-and-trip

25   hazards; that's just incorrect, isn't it?

Page 62

1      A     Well, I was given no policies and
2   procedures to review, so I --
3      Q     She testified multiple places that they
4   had various policies and procedures in effect,
5   correct?
6      A     I would have to look, but I had the -- um,
7   at best, I think she said they were -- Well,
8   actually what my opinions say about what she said.
9            Uh, the bottom of Page 7, Wood, the
10  corporate rep, stated the employee training was done
11  at each store location and on the job by department
12  managers.  No information was provided on how and by
13  whom department managers are trained.
14           And then the last sentence, Wood said she
15  didn't no how vendors got stock in the store, didn't
16  know if vendors had a stocking policy and safety
17  rules, that there are no policies and procedures for
18  keeping the premises safe from slip/trip hazards and
19  they do not do safety sweeps at any time during open
20  stores, that everyone is looking at all times.  I
21  was provided with no policies and procedures, like I
22  have no documentation, other than -- I can go back
23  and look at her words.
24           And remember my opinion is a filter of her
25  deposition into my opinion.  So you may say there

Page 63

1    are policies and procedures, but from a reasonable

2    standard of care for a retail store, normally there

3    are published written policies and procedures and I

4    was provided with nothing.

5         Q    Let's break down the sections of what you

6    are saying there about her testimony.  You say in

7    one part that she testified there are no policies

8    and procedures for keeping the premises safe from

9    slip/trip hazards, right?

10        A    Yes.

11        Q    What she actually testified to is that the

12   store cleans the floors multiple times daily and all

13   employees are instructed to constantly keep a

14   lookout for anything that could be potential while

15   moving through the store, correct?

16        A    Yeah -- I will say yes, because that --

17   you're reading something, so I'll agree.

18        Q    It's from Pages 9 and 10 of her

19   deposition, which you claimed you have, right?

20        A    Yes.

21        Q    And so your report is wrong when it says

22   that she testified there are no policies and

23   procedures for keeping the premises safe from slip

24   and trip hazards, correct?

25        A    So you're -- You're saying that her saying

1    that they mop multiple times a day is a policy and

2    procedure?

3         Q    Yes, I mean, isn't it?  There are a lot of

4    policies and procedures that aren't written,

5    correct?

6         A    Well, and that's actually part of my

7    opinion, if Greer's had written published policies

8    and procedures -- and this is the -- Page 8,

9    published policies and procedures of employee in

10   training, which they don't, they, uh -- and you even

11   said that she's verbally saying this, things would

12   be different.  So I had --

13        Q    But, what your report says is that she

14   testified that there are no policies and procedures

15   for keeping the premises safe from slip-and-trip

16   hazards, that's what your report says on Page 7,

17   correct?

18        A    Yeah.

19        Q    And that's not what she actually testified

20   to, is it?

21        A    Again, per my opinion, if they had

22   published all of these procedures, which they don't,

23   and I was provided with nothing other than her

24   saying they do.  So, uh, I -- I have nothing to see

25   what that is, they mop several times a day.  How do

1    they mop?  Where do they mop?

2         Q    Nowhere did she testify that we have no

3    policies and procedures for keeping the premises

4    safe from slip-and-trip hazards, correct?

5         A    Again, from having done floor care for

6    twenty years --

7         Q    It's a yes-or-no question, did she testify

8    to that or did she not?

9         A    I'd have to pull up my notes if you really

10   want to keep asking me that question, and I don't

11   have them.

12        Q    Okay.  You also say on Page 7 in her

13   deposition, Wood, the corporate representative,

14   stated that employee training was done at each store

15   on the job by department managers.  No information

16   was provided on how and by whom the department

17   managers are trained.  Do you know if Ms. Wood was

18   ever asked that question of how and by whom

19   department managers are trained?

20        A    No.

21        Q    So if the question wasn't asked, you don't

22   really know what procedures or training they have in

23   place in that respect, correct?

24        A    No.

25        Q    And so you would not be in a position to

Page 66

1  criticize that training, would you?

2      A    Well, as I mentioned, I was given no

3  published or written or a list of any training for

4  policies or procedures and methodology for doing

5  anything.  So I --

6      Q    If you have verbal policies and procedures

7  and methodologies that are communicated to the

8  employees, why is that not just as good as having

9  written policies and procedures?

10     A    Well, uh, from my experience of working

11 with like the five top ten -- ten top retailers, it

12 isn't reasonable to expect an employee to know how

13 to do a task if they actually haven't been provided

14 with some sort of training.

15     Q    I'm not saying not provided with training,

16 I'm saying if you provided on-the-job training as

17 opposed to written training?

18     A    Yeah, and I was provided with no

19 information on what -- what -- When she was asked,

20 you know, she described that it was done, but she

21 didn't describe what was done.

22     Q    Where was she asked that, where was she

23 asked to describe what was done?

24     A    What she, uh, I -- I -- You know, I don't

25 want to have an argument with you about this.  But,

1   basically there are no published policies and

2   procedures.  But per my opinion, if they have had

3   published policies and procedures and actual

4   training and actual spill cleanup policy, more

5   likely than not this incident wouldn't have

6   happened.  I've been given no evidence that they

7   have any actual policies and procedures even if

8   they're verbal.

9        Q    Okay.  So going back to my earlier

10  question, let's assume they did have policies and

11  procedures that were verbal that were not written

12  down and the employees were appropriately trained on

13  those policies and procedures, that would be just as

14  good as having something written in a manual

15  somewhere, correct?

16       A    No.

17       Q    Why not?

18       A    Well, uh, analogue, five attorneys do five

19  things different ways, like, uh, how do they know

20  they actually need a reasonable standard of care for

21  floor care in every store if every manager has their

22  own way of doing things.  That is, you know, no

23  indication that there's a reasonable standard of

24  care in any of these stores, all I've been told is

25  it's verbal.

1      Q    Is it your experience -- You said you work

2    for a number of nationwide retailers, correct?

3      A    Yes.

4      Q    Is it your experience that employees after

5    their initial day on the job go back and review the

6    manual on how to clean up spills, and things of that

7    nature; does that happen?

8      A    That's what the managers are supposed to

9    be responsible for.

10     Q    So your testimony -- your sworn testimony,

11   under oath, is that you believe these employees that

12   have manuals that tell them what to do, go back and

13   review those manuals, you know, on a daily basis

14   and -- and figure out exactly how they're supposed

15   to do things, as opposed to somebody just giving

16   them on-the-job training?

17     A    Those are two different questions.  The

18   first one I will say no.  The second one is OJT

19   training isn't reasonable if there's no process

20   defined.

21     Q    Well, a process can be defined without

22   being written, correct?

23     A    Yes, and that's not a reasonable standard

24   of care.

25     Q    Based on what, why do you say it's not a

1    reasonable standard of care?

2        A    Well, again, uh, it's very hard for people

3    to know how to mop a floor if they actually are not

4    being told how to mop a floor.

5        Q    No, I'm not saying they're not told.

6    Suppose they are told, suppose there is a policy in

7    place, they are told exactly how to mop the floor,

8    that is just as good as some piece of paper that is

9    tucked away in some drawer that they're never going

10   to review, right?

11       A    Well, it's not normally a piece of paper,

12   it's normally like the operating procedures and

13   policies for a store.  So, if you're telling me they

14   don't have operating procedures and policies for the

15   store, that's one thing.  But, the, uh -- the

16   on-the-job training normally has to have some basis

17   of fact and process for people to explain verbally,

18   and I was not provided with what that is.

19       Q    Okay.  But if there is a process even

20   though it's not written down, that is sufficient,

21   correct?

22       A    No, I would like to see the process.

23       Q    And you just don't know what that process

24   is, right?

25       A    Well, as mentioned, I was provided with no

Page 70

1    information about what that process is, so I -- I

2    can't opine on any process because I've just been

3    told it's verbal and no one verbalized it in their

4    deposition.

5        Q    Okay.  You also say that Wood, quote, said

6    she didn't know how vendors get stock into the store

7    and didn't know if vendors had a stocking policy and

8    safety rules.  Do you see that?

9        A    Yes.

10       Q    Did you review her deposition notice for

11   the topics upon which she was asked to testify?

12       A    No.

13       Q    Do you know if there were any topics where

14   she had been asked to prepare for and answer

15   questions about vendors who might be stocking in the

16   store?

17       A    No.

18       Q    And nowhere did she testify there were no

19   policies in that regard, she just said she didn't

20   know one way or the other, correct?

21       A    I think that's what I said.

22       Q    Your report also indicates that Ms. Wood

23   testified the store does not, quote, do safety

24   sweeps at any time during open hours because

25   everyone is looking at all times for hazards.  Do

Page 71

1    you see that?

2         A    Yes.

3         Q    I'm sorry, I didn't hear you; did you say

4    yes?

5         A    Yeah.

6         Q    That's false as well, isn't it?

7         A    I don't understand your question.

8         Q    Well, she actually testified they sweep

9    the store multiple times a day and then likewise

10   sweep and mop as needed, correct?

11        A    Are you referring to sweep as an actual

12   physical, they sweep the store, or are you talking

13   about they walk the -- the aisles looking for

14   hazards as in a process to look for hazards?

15        Q    Well, that's what I'm asking you.  You

16   said she testified the store does not, quote, do

17   safety sweeps at any time during open hours?

18        A    Well, they're -- they're -- I would have

19   to look at my notes, but there was no indication, so

20   a safety sweep is a person literally asked to walk

21   around a store to look for slip/trip hazards, things

22   falling off the shelves.  It doesn't matter, for my

23   world, it's going to be related to pedestrian

24   slip/trip hazards -- and -- But a safety sweep, you

25   know, I don't think they sell tennis racquets at

Page 72

1    Greer's, but a tennis racquet on the floor or -- or,

2    like -- like cans on the floor.  And so a safety

3    sweep is a set schedule, normally between 20 to

4    40 minutes every hour, looking for things on the

5    floor.  And there's no indication that Greer's does

6    that at all.  And it's actually one of the reasons I

7    like seeing video 30 to 45 minutes before an

8    incident to see if any employees actually have done

9    a safety sweep.  So that's -- that's the safety

10   sweep comment.

11        Q    Is there any national standard for when a

12   safety sweep must be conducted in a store?

13        A    Well, a reasonable standard of care in a

14   retail environment, um, and -- and even guys like

15   Walmart, Kroger, Target do it to make sure that

16   there are not hazards, particularly in high

17   potential slip areas that include liquids, like this

18   one does.

19        Q    Well, when you say that's a reasonable

20   standard of care, what do you base that on, I mean,

21   is this just what other people that you work with

22   do?

23        A    Well, it's -- it's in a retail

24   environment, there are a lot of things that can end

25   up on the floor.  In -- In this particular case, it

Page 73

1   isn't a product-related spill, it's, uh -- it's

2   water on the floor.  And, again, because I

3   haven't -- I wasn't given a lot of video before the

4   incident to see, um, what else it could be, and also

5   what the employees did.  But, it's -- it's -- it's

6   unreasonable to never go look for hazards in a

7   retail environment because of the probability of

8   oils and waters coming out from different parts of

9   the store.

10            This part of the store is mostly a dry

11  good store.  I didn't inspect the -- like inspect

12  the vegetable aisle, for example, where liquids can

13  be sprayed because they're spraying their vegetables

14  or people are moving stuff around.  But, there's no

15  indication that there is an employee or anybody in

16  the store making sure liquids aren't ending up on

17  the floor.  And it's unreasonable in a retail store

18  to never do that.

19       Q    Well, she actually said that employees are

20  constantly on the lookout for those types of

21  hazards, right?

22       A    Well, that's -- that's a good statement

23  because what kinds of hazards, like they -- what are

24  they looking for, there's no clarification of what

25  are they looking for, and then what they do if they

Page 74

1    find one.

2        Q    Was there any question asked for her to

3    clarify that?

4        A    I don't remember sitting here.

5        Q    You live in Ohio?

6        A    I do.

7        Q    Are you an engineer?

8        A    Mechanical.

9        Q    Mechanical engineer?

10       A    Yes.

11       Q    Are you P. Eng anywhere?

12       A    I am not a P. Eng.

13       Q    My understanding, from looking at your CV,

14   is you got your engineering degree from a school in

15   Canada; is that right?

16       A    Yes.

17       Q    And you're not licensed as an engineer in

18   Florida or any other state, correct?

19       A    No.

20       Q    How does someone become a walkway auditor?

21       A    How does someone?

22       Q    Yes.

23       A    Well, uh, there's a standard ASTM F2948,

24   which is a standard entitled something like

25   certification or qualifications -- Well, actually, I

1    guess I can read it off the back of the opinion.

2    Uh, Standard Guide to Walkway Auditor

3    Qualifications, it lists things to know, things to

4    be aware of.  So at the National First Aid

5    Institute -- Institute, I took a four-day course

6    that met that need to get a certificate of -- the

7    Walkway Auditor Certificate Holder.  And I did a

8    three-day course at the University of Northern Texas

9    with all of the same standards, and I think it was

10   like written test, practical tests and classroom

11   time.

12        Q    After taking a four-day course you were a

13   certificate holder for being a walkway auditor?

14        A    Yes.

15        Q    All right.  Were there any other like

16   prerequisites you had to have, you have to be an

17   engineer or anything like that?

18        A    No.

19        Q    The three-day course after that, was that

20   a different certification or --

21        A    No, they call it a -- it's -- it's on my

22   CV, like a walkway auditor, like walkway safety

23   course or something.  I forget what the title is.

24        Q    Who is your employer?

25        A    Substratum Group.

1    Q    Are you the sole owner of Substratum?

2    A    Yes.

3    Q    At Substratum, do y'all primarily do --

4    Or, well, do you do primarily litigation-type

5    services?

6    A    Right now, uh, I, you know, started this

7    company in 2014, didn't know what an expert witness

8    was, uh, I -- I don't know if you have my expert

9    witness history.  The first case I did was maybe

10   six, seven years ago now.  I can't remember what the

11   date is on that thing.  But I had, when COVID --

12   When COVID hit, we were like 50/50 expert witness

13   naught.  Now I think I'm like 90 or 95 percent

14   expert witness work because there's only me in the

15   company.  So we, uh -- We aren't doing -- I'm not

16   doing as much training and rental of equipment and

17   stuff that we used to do.

18   Q    So almost everything you do now is

19   litigation work for firms like Morgan & Morgan,

20   correct?

21   A    Yeah, I guess.

22   Q    In what percentage of those cases were you

23   retained -- are you retained by the plaintiff as

24   opposed to the defense?

25   A    You, defense guys, I -- I don't not answer

Page 77

1    the phonecall, but it seems I'm about 95 percent
2    plaintiff now, not by choice, it's just word of
3    mouth.
4         Q    How many cases have you testified in total
5    in the last ten years or so for Morgan & Morgan?
6         A    Testify being is -- Do you have my expert
7    witness testimony list, like it should --
8         Q    I got an Excel spreadsheet right before
9    the deposition that had -- I don't know if you can
10   see this, but --
11        A    Yes, yeah, that is what I was looking --
12        Q    Is that all of your testimony back --
13   since just essentially the start of you becoming an
14   expert witness?
15        A    A few, March of last year, I have to -- I
16   think I've got another hundred or so cases I've got
17   to add in there, at least since a year ago.
18        Q    A hundred?
19        A    Yeah, like I'm rounding up.  I think
20   it's -- it's more than fifty, it is less than a
21   hundred, I don't know actually.
22        Q    So you didn't bring any information on
23   those cases and can't provide us any information on
24   those either, right?
25        A    In the last twelve months, no.

1      Q     Well, do you have a sense as to how many

2  cases you have testified for Morgan & Morgan?

3      A     You're talking like -- When you say

4  testify, do you mean opinion, deposition?

5      Q     Yeah, yeah, that's a good point.  How many

6  cases has Morgan & Morgan retained you in?

7      A     I think Morgan & Morgan now is more than

8  50 percent of the cases I've done, uh, as -- as

9  being retained.  So, um, I actually 100, 150, maybe,

10  I -- I've got a lot -- I'm totally wrong with that

11  number, but it's more than fifty, less than 200.

12  Like, I've got to go back and update that

13  spreadsheet.

14      Q     Okay.  Do you plan to do that sometime

15  soon?

16      A     Yeah, but it's -- it's just a slog to do

17  that dang thing, so I'm going to say yes.

18      Q     Is it fair to say that Morgan & Morgan is

19  your number one customer?

20      A     Oh, absolutely, yes.

21      Q     Do you know how much money you have been

22  paid by Morgan & Morgan over the course of your

23  reviewing of cases for them?

24      A     No, not sitting here, like I definitely

25  could sum up that spreadsheet that's in front of

1   you.  I do not know sitting here.

2        Q    Is it more than a quarter million dollars?

3        A    You know, it's -- I don't know, a hundred,

4   two hundred thousand dollars.  I know I'm wrong with

5   that, but it's -- it's not ten thousand and it's not

6   a half a million.

7        Q    Yeah.  Well, I've reviewed some of your

8   prior deposition testimony, there was a deposition

9   last year, where I think it was even -- even back

10  then it was already over a quarter million dollars;

11  would that surprise you?

12       A    I would -- I would -- No, I don't think --

13  No, like I said, I don't think it's over a half a

14  million, but I know it's hundreds of thousands.

15       Q    Do you have any special arrangements with

16  Morgan & Morgan in terms of like fees outside of

17  what's contained in your actual fee schedule?

18       A    No, I -- I don't know what you're asking

19  me, but there is no -- This is the fee schedule and

20  that's it.

21       Q    Well, I thought -- If I recall correctly,

22  I believe in this case, for example, you were coming

23  down on -- maybe to review another matter at the

24  same time, and I was just curious as to whether you

25  give discounts for that, or how that kind of worked?

1      A    No, I -- I -- Why I do that is I try to do
2  multiple cases on the same trip just because I'm
3  busy.  And they, uh, so I -- if I'm in -- I live in
4  Ohio and I have to travel, so I can put all my
5  travel expense into one thing.
6      Q    Okay.  Do you know how much time you have
7  spent on this matter?
8      A    No.
9      Q    Can you ballpark it?
10     A    I don't know if you got -- Well, an
11  inspection, and a report, research, on average it's
12  15, 20 hours.
13     Q    Okay.  Any idea what you've invoiced them
14  today?
15     A    I -- Not sitting here, no, uh, just like,
16  roughly, I -- I -- because normally my retainer is
17  three thousand dollars.  So the, uh -- with an
18  inspection and a report, I mean, this -- and not
19  including travel, this is probably between five and
20  six thousand dollars.  I -- I -- Like when I submit
21  this stuff that you ask for in the deposition,
22  that's all there.  So it's -- I think it best I
23  invoiced two things, one being the retainer, and one
24  being the -- I delivered an opinion invoice.
25     Q    Do you recall if you inspected other

Page 81

1  stores at the same time when you came down to

2  inspect this Greer's location?

3      A     Others -- Greer's stores?

4      Q     Other stores, period, like other

5  establishments.

6      A     Yeah, the more -- I'm -- I'm pretty sure I

7  did other stuff, like that because I come down for a

8  week or something like that, probably.

9      Q     When you come down for a week like that

10 are you're coming down essentially just doing Morgan

11 & Morgan cases?

12     A     Mostly, I don't, uh, because -- uh, yeah,

13 pretty much when I'm doing that.  The other -- other

14 attorneys I work for are further south in Florida, I

15 don't think I have done anything, like south of Fort

16 Myers in a while.

17     Q     Do you know when this Greer's store was

18 constructed?

19     A     No.

20     Q     Do you know when the tile was installed?

21     A     No.

22     Q     The ANSI standards that you referred to in

23 your report, when did those go into effect?

24     A     Which ANSI standards?

25     Q     On dynamic coefficiency of friction.

1      A     They, uh -- uh -- sitting here, oh,

2   actually, I'm just saying, I guess they're on the

3   back of the -- the one I used was the A326-21, the

4   latest one, there are versions four or five years

5   before that.

6      Q     Does that mean it went into effect in

7   2021?

8      A     That version, yes, um, because they have

9   more, uh -- Use Classification Guidance.

10     Q     Okay.  What about the -- Well, strike

11  that.

12            Have you ever been disqualified or

13  precluded from testifying as an expert in any case?

14     A     No.

15     Q     Have you ever had your testimony stricken

16  in any case?

17     A     No, and then -- but, I say not as far as I

18  know because I -- The answer is no, but, I -- I

19  don't recall any particular, like I can't say stuff,

20  things, definitely never been, you know,

21  disqualified.  I see you guys use different words

22  than I do for some stuff, but I'm pretty sure I've

23  never had my testimony restricted.

24     Q     Do you know when the tile was installed in

25  this particular store?

Page 83

1        A      No.

2        Q      Do you know if it was before or after that

3    ANSI standard went into effect?

4        A      No.

5        Q      When you prepared your report, did

6    Plaintiff's counsel edit your report at all or

7    suggest any changes to it?

8        A      Not that I can recall, no.

9        Q      Do you have a copy of your deposition

10   notice in front of you?

11       A      No, actually, I do not.

12       Q      Let me see if I can share my screen.  All

13   right.  Can you see that, Exhibit A?

14       A      I can see it.  I can't read it.

15       Q      Let me try this.  Can you read it now?

16       A      Yeah.

17       Q      All right.  I just want to get through

18   this list and see what documents you might have.  It

19   sounds like you didn't bring any documents with you

20   today; is that correct?

21       A      No, I am sitting in a hotel room.

22       Q      All right.  If you can just read through

23   these.  I don't want to read them out loud

24   necessarily.  But, if you'll just take a quick look

25   and just tell me if you have provided, other than

1   what -- other than what you've referred to as your

2   case file, if you've provided all this other

3   information to Plaintiff's counsel to give to us?

4        A    I can tell you I haven't given her

5   anything right now.  I reviewed -- these -- These

6   are pretty standard questions.  The -- On the --

7   I'll answer it a different way.

8             I have -- I have -- Everything I used for

9   basis of opinions, I share as long as it's not copy

10  written, my CV, my testimony lists, but it's to

11  March, so it's kind of outdated for the last twelve

12  months.  My -- My case notes, I cut and paste out of

13  the software, my opinion, and my photos, and my

14  on-site inspection handwritten notes are -- and then

15  a -- pretty much the -- everything I used for my

16  basis of opinions, to put in my basis of opinions,

17  in my report, my CV answers most of that other stuff

18  and then the -- the Excel spreadsheet answered most

19  of the stuff.  And then if I -- I don't know if

20  there's any other documents requested in there.

21       Q    What about communications, I mean, would

22  you have E-mails with Plaintiff's counsel?

23       A    No, I -- I -- My voicemails, I don't keep.

24  Texts, I don't keep.  E-mails, I don't keep.  But

25  like I mentioned, if I think there's something

Page 85

1    important out of the communication, I'll record it,

2    like inspection completed, or inspections scheduled

3    or, you know, I asked for something, if I -- if I

4    think it's important.  But, mostly, I'm -- the

5    communications I'm getting are like links to a

6    website or something to get documents, so I -- I

7    don't keep the actual E-mails.

8         Q    Why don't you keep those?

9         A    Well, one reason is I get a lot of E-mails

10   and they get buried.  The other one is -- Well, I

11   use Google office back end for our E-mails, and I

12   find they stack.  And then when I -- when I delete

13   something, and it's happened to me before, when I

14   delete something I don't think it's important, it's

15   got like six E-mails attached to it and I've lost

16   something that I thought was important, like it was

17   important.  So I try to keep my E-mails clean

18   because I don't have an admin and scheduling all

19   this stuff is actually a bit of a burden versus just

20   the work.

21        Q    And when you delete those E-mails are you

22   able to go back and recover them?

23        A    No.

24        Q    Have you ever tried to do that?

25        A    No, I actually haven't.

1      Q    So you don't know if you can recover them

2    or not, do you?

3      A    I -- I know it empties out, I just don't

4    know how long, like if they delete, they don't stay

5    there for --

6      Q    Sure.  But they stay there for a certain

7    period of time, right?

8      A    I like -- I don't know.  I just delete

9    them, so I've never, like I said, gone back to see

10   what is sitting there.

11     Q    What about text messages, did you have any

12   text messages with opposing -- or Plaintiff's

13   counsel in this case?

14     A    Yeah.

15     Q    Do you still have those?

16     A    Maybe the recent ones, like -- like I

17   deleted the E-mail with the Zoom call this morning,

18   the footer, that can of stuff, or --

19     Q    But I'd ask you to save that text history

20   and not delete it, because I would like to see a

21   copy of it.

22     A    Sure.

23          MR. STEVENS:  Those are all my questions.

24   Thank you for coming in today.

25          THE WITNESS:  Thank you very much.

Page 87

1                    EXAMINATION
2     BY MS. CHILDS:
3         Q    All right.  Good morning, Mr. Collette, I
4     have a couple of followup questions for you.
5             So you testified earlier you're currently
6     traveling for work; is that correct?
7         A    Yes.
8         Q    And you're located in a hotel room as you
9     are giving your testimony today?
10        A    Yeah.
11        Q    You received this notice of deposition for
12    today's deposition on May 7th; is that accurate?
13        A    I don't remember the actual -- when I got
14    the actual E-mail of the thing.  I knew I -- I knew
15    it was scheduled, like the -- the date, so it's in
16    my calendar.  That -- I -- I didn't -- I don't
17    recall when I actually got the piece of paper to do
18    this stuff.
19        Q    And you testified earlier that you have
20    case notes and E-mails and other written
21    communications regarding this case, would having
22    those case notes and E-mails help you to accurately
23    testify regarding your interactions with Plaintiff's
24    counsel's office regarding this matter?
25        A    Yes.

1        Q    All right.  Is it fair to say you learned

2   quite a bit of new information when you had the

3   chance to finally review the surveillance video

4   concerning this incident -- or of the incident?

5               MR. STEVENS:  Objection to form.

6        Q    (BY MS. CHILDS:)  You can answer.

7        A    Yes.

8        Q    Without viewing this video you would not

9   have been able to know -- figure out or know the

10  exact location of the plaintiff's fall in this case;

11  is that correct?

12       A    Yes.

13       Q    You wouldn't have known about the pallet

14  of liquid merchandise being placed directly at the

15  location of the fall before Mr. Demboske fell in

16  Greer's; is that accurate?

17       A    Yes.

18       Q    You wouldn't have known about the

19  placement of the shopping cart left in the path of

20  egress by the Greer's employee that's depicted on

21  the video without viewing the video; is that

22  correct?

23               MR. STEVENS:  Object to the form.

24               THE WITNESS:  Yes.

25       Q    (BY MS. CHILDS:)  You wouldn't have known

Page 89

1     about the Greer's employee walking by the hazard

2     twice before Mr. Demboske fell; is that accurate?

3               MR. STEVENS:  Object to the form.

4               THE WITNESS:  Yes.

5         Q    (BY MS. CHILDS:)  All right.  Back in

6     February you did not have -- and I'm talking about

7     February of 2024, you did not have the corporate

8     rep's deposition transcript that discusses the

9     existence of any policies or procedures; is that

10    correct?

11        A    Uh, yes.  Yes.

12        Q    All right.  Had you not seen the

13    surveillance video of this incident, you would have

14    not known or had any reason to know about the

15    Greer's employees' mopping standards or cleanup

16    protocol after Mr. Demboske fell?

17              MR. STEVENS:  Object to the form.

18              THE WITNESS:  Yes.

19        Q    (BY MS. CHILDS:)  All right.

20    Mr. Collette, is it fair to say that the information

21    that you gained from viewing the video and the

22    corporate rep's deposition transcript proved to be

23    critical to your findings as written in your report

24    in this case?

25              MR. STEVENS:  Object to the form.

Page 90

1        THE WITNESS:  Yes.

2        MS. CHILDS:  I don't have any other

3   questions for you, Mr. Collette, we appreciate your

4   time.

5        MR. STEVENS:  I don't have anything else

6   either.  Thank you.

7        MS. CHILDS:  Mr. Collette, would you like

8   to read or waive the deposition transcript?

9        THE WITNESS:  Read, please.

10        MS. CHILDS:  Madam Court Reporter, witness

11   will read, and if it is ordered, Plaintiff will

12   order an electronic version.

13        THE COURT REPORTER:  Okay, I need an

14   address where you want the read and sign sent to,

15   please.

16        MS. CHILDS:  Mr. Collette, you want to

17   give her your E-mail?

18        THE WITNESS:  Yes, please, it's

19   david@substratumgroup, S-U-B-S-T-R-A-T-U-M,

20   Group.com.

21        MS. CHILDS:  And he can do that

22   electronically, right, just sign off on it, sign it?

23        THE COURT REPORTER:  Yes, he can.

24

25            FURTHER DEPONENT SAITH NOT

Page 91

1                   C E R T I F I C A T E

2

3     STATE OF ALABAMA    )

4     MOBILE COUNTY       )

5

6          I hereby certify that the above proceedings

7          were taken down by me and transcribed by me

8          using computer-aided transcription, and that

9          the above is a true and correct transcript of

10         the said proceedings given by said witness.

11         I further certify that I am neither of counsel

12         nor of kin to any of the parties nor in anywise

13         financially interested in the outcome of this

14         case.

15         I further certify that I am duly licensed by

16         the Alabama Board of Court Reporting as a

17         Certified Court Reporter as evidenced by the

18         ACCR number following my name found below.

19

20

21         DONNA E. HENDERSON, ACCR #265

           14752 County Road 3

22         Fairhope, Alabama  36532

23

24

25

Page 92

1   To: David Collette
2   Re: Signature of Deponent David Collette
3   Date Errata due back at our offices: 30 days
4
5   Greetings:
6   This deposition has been requested for read and sign by
    the deponent.  It is the deponent's responsibility to
7   review the transcript, noting any changes or corrections
    on the attached PDF Errata.  The deponent may fill
8   out the Errata electronically or print and fill out
    manually.
9
10  Once the Errata is signed by the deponent and notarized,
    please mail it to the offices of Veritext (below).
11
12  When the signed Errata is returned to us, we will seal
    and forward to the taking attorney to file with the
13  original transcript.  We will also send copies of the
    Errata to all ordering parties.
14
15  If the signed Errata is not returned within the time
    above, the original transcript may be filed with the
16  court without the signature of the deponent.
17
18  Please Email the completed errata/witness cert page
    to CS-SOUTHEAST@VERITEXT.COM
19  or mail to
20  Veritext Production Facility
21  2000A Southbridge Parkway, Suite 400
22  Birmingham, AL 35209
23  800-808-4958
24
25

Page 93

1  ERRATA for ASSIGNMENT #6637747
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that

3

4  ____ There are no changes noted.
5  ____ The following changes are noted:

6

   Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7  (2017). Rule 30(e) states any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.

10

11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24

25

Page 94

1    Page _____ Line _____ Change _____

2    _____

3    Reason for change _____

4    Page _____ Line _____ Change _____

5    _____

6    Reason for change _____

7    Page _____ Line _____ Change _____

8    _____

9    Reason for change _____

10   Page _____ Line _____ Change _____

11   _____

12   Reason for change _____

13   Page _____ Line _____ Change _____

14   _____

15   Reason for change _____

16

17

18                   _____

                          DEPONENT'S SIGNATURE

19

     Sworn to and subscribed before me this ____ day of

20

          _____, _____.

21

22   _____

23    NOTARY PUBLIC / My Commission Expires:_____

24

25

**[& - actually]**

| & | | | |
|---|---|---|---|

**&**   1:10 4:3,12
   17:18 18:19
   29:20 76:19
   77:5 78:2,6,7,18
   78:22 79:16
   81:11

**0**

**0.42**   35:18 37:20
   37:22 44:16
**0.48**   35:21

**1**

**1**   27:24
**10**   63:18
**100**   78:9
**11**   4:9
**12**   30:5,6
**14752**   91:22
**15**   80:12
**150**   78:9
**18287**   91:21

**2**

**2**   22:7,10 27:24
   53:20
**20**   72:3 80:12
**200**   32:15 78:11
**2000a**   92:21
**2014**   76:7
**2017**   93:7
**2021**   82:7
**2023**   31:25
**2024**   1:16,25 6:9
   7:2,9 9:1,7
   11:14,16 19:20

   30:19 32:1 89:7
**20290**   4:10
**220**   4:4
**24**   6:6 19:23
**24/01/19**   6:1
**24717**   1:5
**26**   9:9,11
**265**   91:21
**27th**   21:20
**29th**   7:2,9 9:1,7
   9:13,18 11:16
   19:25 20:3

**3**

**3**   91:22
**30**   72:7 92:3
   93:6,7
**32502**   4:5
**35209**   92:22
**36532**   91:22
**36602**   4:10
**3:23**   1:5

**4**

**4**   27:21,22 53:20
**40**   72:4
**400**   92:21
**42**   37:8,10 38:15
   38:23 39:1,3,7,9
   39:15 44:9
**45**   72:7
**48**   37:10 38:17
   38:23 39:1,8,16

**5**

**5**   3:3 36:24
**5-30**   93:6
**50**   78:8
**50/50**   76:12
**57470**   4:9
**5th**   19:20 20:3

**6**

**6**   35:15 38:10
   42:23 57:18
**6637747**   93:1

**7**

**7**   62:9 64:16
   65:12
**7th**   87:12

**8**

**8**   64:8
**800-808-4958**
   92:23
**8326.3**   23:15

**9**

**9**   1:16 63:18
**90**   76:13
**95**   76:13 77:1
**9:00**   1:17 5:6
**9th**   1:25 4:4

**a**

**a.m.**   1:17 5:6
**a326**   38:11
**a326-21**   82:3
**a326.3**   37:24
   38:13,24

**able**   32:9 85:22
   88:9
**above**   5:7 39:14
   43:23 91:6,9
   92:15
**absolutely**
   24:17 52:12
   78:20
**access**   6:5
**accident**   12:17
   16:19 27:17,19
   30:18 31:24
   46:24,25 47:18
   49:14 52:22
   53:15
**accr**   91:18,21
**accurate**   87:12
   88:16 89:2
**accurately**
   87:22
**acronym**   35:2,5
**acting**   5:2
**activities**   9:25
**actual**   31:5 67:3
   67:4,7 71:11
   79:17 85:7
   87:13,14
**actually**   8:12,19
   11:2,3 12:9
   22:16,19 24:11
   25:14 28:25
   34:14 36:14
   40:19 50:8 56:5
   57:13 59:11
   62:8 63:11 64:6

64:19 66:13
67:20 69:3 71:8
72:6,8 73:19
74:25 77:21
78:9 82:2 83:11
85:19,25 87:17
**add**  77:17
**additional**  9:18
93:9
**address**  90:14
**adhesion**  36:6
**adjustor**  48:7
**admin**  85:18
**admission**  35:24
**advance**  16:21
**advertise**  46:7
**affect**  28:24
30:25 32:2,6
**ago**  8:4 44:14
76:10 77:17
**agree**  16:19
51:16 63:17
**agreed**  1:21 2:1
2:7,14
**ahead**  14:24
22:6 50:11,17
**aid**  75:4
**aided**  91:8
**airport**  19:17
**aisle**  11:12
48:17 54:17,19
73:12
**aisles**  71:13
**al**  92:22

**ala**  93:6
**alabama**  4:10
5:2 91:3,16,22
**alex**  56:7
**allowed**  42:2
**america**  42:6,15
**american**  42:17
**analogue**  67:18
**analogy**  60:5
**analysis**  13:8
27:6
**ansi**  37:23,24
38:24 39:2
81:22,24 83:3
**answer**  30:9,22
42:10,22 45:12
54:6 70:14
76:25 82:18
84:7 88:6
**answered**  84:18
**answers**  59:6
84:17
**anybody**  16:13
41:20 73:15
**anymore**  36:20
**anytime**  21:13
**anywise**  91:12
**apart**  32:15
**apartment**
12:21
**appearing**  4:5
4:11
**applicable**
35:24

**application**  29:6
**applied**  34:20
42:1
**appreciate**  90:3
**appropriate**
59:21
**appropriately**
67:12
**approximate**
30:17
**approximately**
27:18
**april**  9:9,11
**area**  53:23
**areas**  72:17
**argument**  66:25
**arrangements**
79:15
**asked**  9:22 10:3
13:16,18 14:7
15:3 25:15
26:11 29:14,19
30:20 65:18,21
66:19,22,23
70:11,14 71:20
74:2 85:3
**asking**  10:18
14:17 19:1
44:23,24 45:19
65:10 71:15
79:18
**assign**  2:11
**assignment**  93:1
**assist**  93:8

**assistants**  29:21
**assume**  27:11
32:5 67:10
**assuming**  19:24
50:5
**astm**  12:14,16
23:9 46:3 74:23
**attach**  6:12 93:9
**attached**  85:15
92:7
**attaching**  36:8
**attend**  48:10,18
**attention**  7:6
**attorney**  7:5
16:11 20:10,16
57:6 92:12
**attorneys**  67:18
81:14
**audio**  48:6,16
**auditor**  12:15
51:15 74:20
75:2,7,13,22
**autry**  1:10 4:12
**average**  35:20
42:17 50:16
52:15 80:11
**averaged**  34:15
**aware**  6:21
40:15 49:12
50:1 53:22 75:4

**b**

**b**  90:19
**back**  11:15 14:9
26:9 33:13 42:7
49:3,4 61:2

62:22 67:9 68:5
68:12 75:1
77:12 78:12
79:9 82:3 85:11
85:22 86:9 89:5
92:3
**background**
47:10
**bald** 25:1
**ballpark** 80:9
**bar** 4:9
**base** 72:20
**based** 17:1,8
18:16 45:19
50:11 55:7
68:25
**basic** 48:16
56:17
**basically** 6:6
24:20 34:17
56:9,23 67:1
**basis** 49:2 50:8
57:18 59:4
68:13 69:16
84:9,16,16
**bat** 14:10
**bdo** 31:12
**becoming** 77:13
**beginning** 5:6
**behalf** 4:5,11
**behavioral**
42:19
**believe** 6:8 12:5
13:9 35:1 53:9
54:1 58:8 68:11

79:22
**believes** 41:12
**best** 6:8 7:12
17:5 62:7 80:22
**better** 6:15 16:1
**big** 26:12 30:11
30:13
**biomechanical**
47:9
**biomedical** 47:6
**birmingham**
92:22
**bit** 39:18 85:19
88:2
**board** 91:16
**boil** 40:2
**boils** 43:4
**bold** 33:1
**bone** 47:13
**bong** 49:13
**bottom** 25:1
36:7 62:9
**box** 30:11,13
**brand** 29:2
**brands** 30:4
**break** 63:5
**bring** 6:16 10:3
58:11 61:20
77:22 83:19
**broke** 38:8
**broom** 42:8
**brought** 22:2
**bucket** 60:20
**buffing** 31:4

**building** 12:21
**bunch** 17:17
**burden** 85:19
**buried** 85:10
**busy** 80:3

**c**

**c** 4:1 91:1,1
**calendar** 87:16
**call** 21:14 24:12
25:7 37:14
43:18 75:21
86:17
**calling** 21:6
**cameras** 15:11
**canada** 74:15
**cannabis** 49:14
**cans** 72:2
**car** 24:21 25:1,2
59:17,24
**cardboard** 26:2
**care** 61:11 63:2
65:5 67:20,21
67:24 68:24
69:1 72:13,20
**cart** 88:19
**case** 1:5 5:24
6:4,12,14,21
7:16,25 8:25
9:20,23 11:1
13:6,13 15:3
16:15 17:9
18:15 19:7,12
19:15 20:8,25
21:4,10 22:2
23:6 25:24 26:9

26:21 27:25
31:6 39:6,11
40:7 45:18 49:4
49:6 57:14 58:7
58:11,12 72:25
76:9 79:22
82:13,16 84:2
84:12 86:13
87:20,21,22
88:10 89:24
91:14
**cases** 12:14
17:17 18:2
40:13 76:22
77:4,16,23 78:2
78:6,8,23 80:2
81:11
**causation** 46:21
**cause** 5:7 25:16
46:17,24,24
47:1,3,18,22
51:13 54:9
**caused** 8:1
55:21
**causes** 47:20,23
**causing** 7:6,20
**caveat** 39:8
**ceramic** 23:17
**cert** 92:18
**certain** 7:23 9:5
14:7 18:12,13
86:6
**certainly** 51:15
**certainty** 54:7

certificate 75:6
75:7,13
certification
74:25 75:20
certified 91:17
certify 5:3 91:6
91:11,15 93:2
chance 88:3
change 21:15,17
31:5 93:11,13
93:14,16,17,19
93:20,22,23
94:1,3,4,6,7,9
94:10,12,13,15
changes 83:7
92:7 93:4,5,7
characteristic
32:16
characteristics
27:8 34:19
childs 3:4 4:3
87:2 88:6,25
89:5,19 90:2,7
90:10,16,21
choice 77:2
chosen 41:24
civil 5:4 93:6
claimed 34:1
63:19
clarification
9:22 73:24
clarify 74:3
classification
82:9

classroom 75:10
clean 44:3 68:6
85:17
cleaning 60:10
cleans 58:15
63:12
cleanup 25:15
51:22,25 56:18
59:13,15 60:14
60:15,17,25
61:10,12 67:4
89:15
cleanups 60:11
clear 51:20
client 15:13
16:6
climbing 50:12
close 34:17
coated 22:12,14
22:16,22,24
27:16 30:1
coating 28:18
31:5
coca 53:23
code 93:6
coeffcent 44:5
coefficiency
81:25
coefficient
22:21 23:10,11
23:16,22 24:16
31:8,14 33:7,10
34:19 35:1,4,7
35:13 36:6,12
36:18,24 40:23

43:9 44:8 45:2,7
46:5
coeffient 43:10
coincidence
55:15
coke 55:2
cola 53:23
collected 31:16
collette 1:15,23
5:7,11,21 87:3
89:20 90:3,7,16
92:1,2
come 10:25
31:25 81:7,9
comes 60:19
coming 20:11
54:25 73:8
79:22 81:10
86:24
comment 72:10
commercial
23:18 39:4,6
40:20,25
commission
94:23
commissioner
1:24 2:16 5:2
committee
22:19,20 36:22
communicated
66:7
communication
21:5 85:1
communicatio...
6:5 8:9 9:25

84:21 85:5
87:21
company 76:7
76:15
complaint 10:16
11:5 14:15
complaints 48:5
complete 9:19
10:4
completed 85:2
92:18
completely
60:22
compliance 2:4
comply 17:22
components
24:14
composition
28:20,22 29:25
computer 91:8
concerning 88:4
concrete 30:8
41:19 42:8
45:16
condition 28:8
49:25
conditions 38:7
38:8
conducted
30:19 72:12
consider 6:2,6
12:25 26:15
47:19
considered
12:14,18,22

23:14 25:12
43:20 44:1
47:22 48:24
**consistent** 39:2
**constantly**
58:17 63:13
73:20
**constructed**
81:18
**consumer** 41:9
**contacted** 5:22
6:7,9,20
**contained** 28:13
79:17
**contaminant**
22:13 33:20,21
**contaminants**
37:7 38:2
**contamination**
39:12
**contend** 28:8
**content** 8:17
**context** 47:11
**continue** 43:25
**contribute**
52:21
**contributed**
49:19 50:6 53:1
53:15 54:4
**conversation**
21:11,19
**copied** 6:4
**copies** 92:13
**copy** 10:4 83:9
84:9 86:21

**corporate** 15:13
16:6,14 20:6
56:6 62:10
65:13 89:7,22
**correct** 7:14 9:2
9:7 10:5 12:12
15:5 16:16
17:15,18,22
18:8 19:11,25
20:6 27:14 29:7
30:1,14 32:3,25
33:16 34:8 35:2
35:5,13,21
37:23 38:15,17
39:22,25 40:17
42:3,6 43:1,4,14
43:19,21 44:16
45:11 46:21,22
49:9 52:22 53:1
53:11 54:2
57:17 58:4 62:5
63:15,24 64:5
64:17 65:4,23
67:15 68:2,22
69:21 70:20
71:10 74:18
76:20 83:20
87:6 88:11,22
89:10 91:9
**corrections** 92:7
93:9
**correctly** 79:21
**correlated**
45:13 54:9

**costs** 30:9
**counsel** 1:22 2:9
2:10 5:5,22 8:10
9:17 10:8,11
11:17 15:14
16:5 20:4,23
21:12,20 83:6
84:3,22 86:13
91:11
**counsel's** 87:24
**county** 91:4,22
**couple** 87:4
**course** 28:1
31:23 37:3 48:2
75:5,8,12,19,23
78:22
**court** 1:1 2:5
5:1,13,16 6:21
17:21 18:2,6,25
19:3,24 20:15
22:2 90:10,13
90:23 91:16,17
92:16
**covered** 28:24
29:15
**covid** 76:11,12
**create** 32:19
**critical** 29:16
89:23
**criticize** 66:1
**crocs** 24:23
**crucial** 12:10,11
21:25
**cs** 92:18

**csr** 1:24 5:1
**curious** 57:12
79:24
**currently** 87:5
**customer** 78:19
**cut** 84:12
**cute** 41:14
**cv** 1:5 74:13
75:22 84:10,17
**cvt** 30:5,7

**d**

**d** 4:3,8
**d2047** 23:9
**dad** 60:5
**daily** 58:16
63:12 68:13
**dang** 78:17
**dangerous** 28:7
28:9
**data** 17:4,8 21:7
27:12 29:5
31:13 33:9
34:16
**date** 5:3,25 6:3
6:11 7:6,7,21,23
8:1,6,8,11,21,23
8:24 9:5,8 10:1
10:2,19 13:22
14:16 18:12,13
18:21,21 19:8,8
27:17,18 30:18
31:18 76:11
87:15 92:3
**dates** 11:22 12:3

**david**  1:15,23
  5:6,11 90:19
  92:1,2
**davis**  4:8
**day**  1:25 6:2
  7:19 8:2,2,5,6
  9:9,9 18:15,18
  31:7,7 32:11
  33:25 64:1,25
  68:5 71:9 75:5,8
  75:12,19 94:19
**days**  6:3 14:11
  19:23 92:3
**dcof**  35:5,17,20
  37:14,20 38:15
  38:22 39:1 40:4
  42:24 43:12
  44:15 45:10,14
**dct**  23:25
**deadline**  7:8,11
  7:13,17 9:13,15
  9:17 18:14 19:7
  19:10,24,25
  20:3
**deadlines**  17:22
  18:6,23 19:3
**deal**  41:15
**december**  6:11
  6:14
**defendant**  1:11
  4:12
**defendant's**
  59:5
**defense**  76:24
  76:25

**defer**  49:23
**defined**  44:9
  55:25 56:19,24
  56:24,24 68:20
  68:21
**definitely**  13:25
  17:3 18:4 54:15
  78:24 82:20
**degree**  74:14
**delete**  85:12,14
  85:21 86:4,8,20
**deleted**  86:17
**deliver**  7:19 8:2
  8:5 9:5 18:13,18
**deliverable**  58:6
**deliverables**
  18:9
**delivered**  9:10
  14:3 18:15,16
  18:22 19:8
  80:24
**delivery**  7:7 8:8
  54:16
**demanding**  20:7
**demboske**  1:7
  4:6 11:7 22:11
  23:22 25:25
  34:1 48:1 49:13
  50:1 52:8,24
  53:13 54:10
  88:15 89:2,16
**demboske's**
  49:8 53:24
**dep**  16:14

**department**
  62:11,13 65:15
  65:16,19
**depend**  43:8
**dependent**
  44:21
**depending**  43:6
**depends**  13:12
  31:2
**depicted**  88:20
**deponent**  90:25
  92:2,6,7,10,16
**deponent's**  92:6
  94:18
**depose**  21:24
**deposition**  1:14
  1:23 2:2,3,15
  16:5 26:5,8,11
  48:21 49:17
  56:6 57:2,13,24
  58:6 62:25
  63:19 65:13
  70:4,10 77:9
  78:4 79:8,8
  80:21 83:9
  87:11,12 89:8
  89:22 90:8 92:6
  93:8
**depositions**  2:6
**depth**  11:5
**describe**  66:21
  66:23
**described**  56:12
  66:20

**description**  11:4
  25:25
**descriptions**
  56:15
**design**  32:13
**desire**  93:7
**develop**  15:1
  17:1 21:8 33:8
**developed**  18:16
**developing**
  14:25 17:3
**die**  51:4
**difference**  23:7
  23:8
**different**  12:20
  12:22 19:18
  26:15 31:9,15
  32:17 64:12
  67:19 68:17
  73:8 75:20
  82:21 84:7
**dimensional**
  25:8
**directed**  16:13
**directly**  31:17
  48:8 88:14
**dirt**  51:7
**disclosures**  7:1
  17:24 19:4
**discounts**  79:25
**discovery**  10:17
  14:15
**discuss**  57:6
**discussed**  13:14

discusses  89:8
discussion
   11:24
discussions  9:16
disparaging
   57:9
disqualified
   82:12,21
disregarded
   18:24
disrespect  31:20
district  1:1,2
division  1:3
doctor  47:5
document  8:23
   59:10,12 61:9
   61:10,14,14,15
   61:16
documentation
   15:25 56:19
   61:7 62:22
documentations
   60:12
documents
   15:23 56:10
   83:18,19 84:20
   85:6
doing  17:20
   31:4 53:14
   59:22 66:4
   67:22 76:15,16
   81:10,13
dollars  79:2,4
   79:10 80:17,20

donna  1:24 5:1
   91:21
drawer  69:9
drip  61:1
driven  18:10
driving  8:8
droplet  25:18
   26:12,13,15,17
   26:17
droplets  25:12
   25:12,16,22
   26:1,4,8,10,12
   26:14,16,19,20
drops  24:12
dry  23:11,12
   24:17 25:21
   35:1,2,7 36:15
   36:18,23 37:2
   46:6 73:10
due  7:1 8:11
   16:21,23 17:11
   92:3
duly  5:12 91:15
dynamic  23:16
   35:4,12 36:5,11
   43:10 44:4 45:2
   81:25

**e**

e  1:24 4:1,1 5:1
   8:9,12,16 84:22
   84:24 85:7,9,11
   85:15,17,21
   86:17 87:14,20
   87:22 90:17
   91:1,1,21 93:6,7

earlier  33:13
   48:20 67:9 87:5
   87:19
early  6:14 16:20
easy  19:14,16
edit  83:6
effect  2:4 36:13
   62:4 81:23 82:6
   83:3
egress  88:20
either  29:20
   31:7 32:16
   54:14 61:20
   77:24 90:6
electronic  90:12
electronically
   90:22 92:8
eliminates  23:21
   37:10,13
email  92:18
employee  55:2
   56:1 59:11
   60:18 61:10
   62:10 64:9
   65:14 66:12
   73:15 88:20
   89:1
employees
   58:16 63:13
   66:8 67:12 68:4
   68:11 72:8 73:5
   73:19 89:15
employer  75:24
empties  86:3

eng  74:11,12
engaged  19:6
engagement
   47:4
engineer  41:15
   74:7,9,17 75:17
engineering
   74:14
entered  54:16
   93:8
entitled  74:24
environment
   14:17 37:4 39:4
   39:15 40:21,22
   45:20 50:14,17
   50:19 51:23
   52:1 72:14,24
   73:7
environments
   12:23 14:19
   15:11
equal  35:18
   37:20 38:22
   44:15
equipment
   76:16
errata  92:3,7,8
   92:10,12,13,15
   92:18 93:1
errors  57:10
especially  24:13
   24:19 37:10
   38:5 41:3
essentially
   32:25 39:20

**[essentially - finish]**

42:13 77:13 81:10

**establishment** 39:22

**establishments** 81:5

**evaluate** 27:11 37:3

**evaluated** 47:22

**evaluating** 23:4

**evaporates** 32:19

**event** 9:6

**everest** 50:13 51:3

**everybody's** 58:21

**evidence** 2:13 67:6

**evidenced** 91:17

**evident** 31:11

**evin** 4:3 29:20

**exact** 21:18 52:14 88:10

**exactly** 59:3 68:14 69:7

**examination** 3:2 5:8,19 87:1

**examined** 5:13

**example** 25:17 45:16 60:18 73:12 79:22

**excel** 77:8 84:18

**except** 2:9

**exhibit** 83:13

**exhibits** 3:8

**existence** 89:9

**expect** 51:11,12 66:12

**expense** 80:5

**experience** 29:23 66:10 68:1,4

**expert** 6:25 17:15,24 19:24 42:12,18 46:18 47:9 49:16 76:7 76:8,12,14 77:6 77:14 82:13

**expired** 9:18

**expires** 94:23

**explain** 58:22 69:17

**explains** 28:11

**explanation** 28:13

**extent** 27:24 28:3

**exterior** 12:21

**extra** 39:17

**f**

**f** 91:1

**f2948** 12:14 74:23

**f3132** 46:3

**facilities** 23:18

**facility** 13:5 59:12 92:20

**fact** 9:21 27:12 40:9 41:18 50:22 60:23 69:17

**factors** 47:12

**facts** 17:4 48:17

**factual** 57:10

**fail** 52:20

**fair** 10:24 20:22 44:5 78:18 88:1 89:20

**fairhope** 91:22

**fall** 12:19 39:13 49:20 50:6 53:1 53:24 54:5 56:2 59:13 88:10,15

**falling** 12:20 71:22

**falls** 31:12 36:7 41:16

**false** 71:6

**familiar** 20:15 22:17

**far** 26:11 82:17

**father** 60:13

**february** 7:2,9 9:1,7,13,18 11:14,16 19:20 19:25 20:3,3 21:20 30:19 31:25 89:6,7

**federal** 5:4 6:21 17:21 18:2,6,24 19:3,24 20:14

**fee** 79:17,19

**feel** 42:12 48:7 48:18

**fees** 79:16

**feet** 32:15 51:6

**fell** 22:13 32:22 32:24 33:15 34:22 88:15 89:2,16

**felt** 55:20

**fifty** 21:2 77:20 78:11

**figure** 68:14 88:9

**file** 10:4 22:2 58:4,10 84:2 92:12

**filed** 92:15

**filing** 2:15

**fill** 59:17,24 92:7,8

**filter** 62:24

**finally** 30:18 88:3

**financially** 91:13

**find** 8:13 41:3 50:19 74:1 85:12

**findings** 89:23

**fine** 5:17

**finish** 15:21 22:12,14,17,18 22:19,22,23,24 23:10,13 24:1,4

24:5,6,7,13,15
24:20 25:3,4,21
26:25 27:11,13
27:17 28:25
29:16,16 30:1,8
30:16,21 31:6
31:11,15,17,18
32:13,18 33:4,6
33:12,21,23
34:18 36:10,15
36:17,25 40:8
45:20 46:4,9,10
46:11 54:12
**finishes**  29:24
**firm**  17:18
**firms**  76:19
**first**  5:12,21 6:9
7:8 10:7 13:13
28:5,6,7,14
46:15 57:6 59:6
68:18 75:4 76:9
**five**  21:2 66:11
67:18,18 80:19
82:4
**flip**  24:23 41:4
**flipping**  34:13
**floor**  4:4 13:18
13:19 14:3
15:21 22:11,12
22:14,17,18,19
22:22,22,22
23:10,13,13,23
24:1,4,5,6,7,8
24:13,15,19,20
25:3,4,21 26:25

27:11,16 28:16
28:25 29:15,16
29:23 30:1,7,16
30:21,25 31:6
31:11,15,17,18
31:22,25 32:2
32:10,12,17,20
33:4,6,12,18,21
33:22 34:2,7,18
35:8,23 36:10
36:14,17,25
37:9,25 38:3,4
38:20 39:4,11
39:13,14,20,24
40:5,7,10 41:5
41:12,23 42:1,8
42:14,16 45:20
46:1,4,9,11 50:2
50:15,24 51:19
52:9,12 54:12
55:9,21 56:17
57:7 65:5 67:21
69:3,4,7 72:1,2
72:5,25 73:2,17
**flooring**  29:25
35:16,25 37:19
38:13,21,25
41:24 44:14
**floors**  24:4
32:19 40:21,22
41:22 54:14
58:15 63:12
**flops**  24:23 41:4
**florida**  1:2 4:5,9
24:25 41:3

74:18 81:14
**florie**  4:8
**flow**  9:24 21:5
**focus**  47:24
**focused**  59:11
**follow**  60:4
**following**  5:8
91:18 93:5
**follows**  5:14
**followup**  87:4
**food**  35:17 36:1
37:19 38:22
44:14
**foot**  25:19,20,20
32:10
**footer**  86:18
**force**  2:4
**forced**  18:13
**foregoing**  5:4
**foreseeable**
24:24 51:23
**forest**  51:7
**forget**  75:23
**form**  2:9 55:10
88:5,23 89:3,17
89:25 93:7,9
**format**  6:24
30:6
**fort**  81:15
**forth**  8:11 37:23
61:2
**forward**  51:17
92:12
**found**  91:18

**four**  50:11,16
52:6,15 53:10
75:5,12 82:4
**free**  37:7,7 38:1
38:3
**friction**  22:21
23:10,11,16,22
24:16 31:9,14
33:7,10 34:19
35:1,5,8,13 36:6
36:12,19,24
40:24 43:10,10
44:5,8 45:2,7
46:5 81:25
**front**  5:24 14:22
22:8 50:3 51:17
53:10 56:8 57:4
58:13 61:18
78:25 83:10
**full**  2:4 16:22
**furnish**  93:9
**further**  2:1,7,14
51:9 81:14
90:25 91:11,15

**g**

**gained**  89:21
**gait**  47:14
**garden**  4:4
**gas**  59:18,25
60:6,6,7,8
**general**  32:5
40:14 41:11
44:24
**generalized**
44:22

**getting** 9:21
11:24 39:19
42:11 47:16
85:5
**give** 20:9 46:7
47:13 79:25
84:3 90:17
**given** 9:15 13:1
13:13,19 14:14
16:9 19:10
55:11 56:12,22
61:8 62:1 66:2
67:6 73:3 84:4
91:10 93:8
**gives** 38:7
**giving** 68:15
87:9
**go** 8:23 11:15
14:9,24 19:16
21:4 22:5,6 26:9
40:19 41:9,9,18
44:11 49:4
53:21 62:22
68:5,12 73:6
78:12 81:23
85:22
**goals** 56:24
**going** 6:13 9:4
11:15 21:23,23
22:4 27:21 30:8
32:25 33:13
34:7,22 37:17
40:5,16 47:13
49:10 51:5,8,24
52:6 55:2 56:13

67:9 69:9 71:23
78:17
**good** 60:21 66:8
67:14 69:8
73:11,22 78:5
87:3
**google** 85:11
**great** 24:3,4,5
**greater** 35:17
36:25 37:20
38:22 44:15
**greer** 1:10 4:12
**greer's** 55:25
56:6,20 59:8
60:18,25 64:7
72:1,5 81:2,3,17
88:16,20 89:1
89:15
**greetings** 92:5
**grocery** 12:19
42:15,15 45:23
46:2
**grounds** 2:11
**group** 75:25
**group.com.**
90:20
**guess** 11:7 36:13
42:11 49:1 75:1
76:21 82:2
**guidance** 82:9
**guide** 75:2
**guy** 49:21
**guys** 14:14
20:19 41:3
72:14 76:25

82:21

### h

**half** 19:17 79:6
79:13
**halfway** 37:12
**handwritten**
84:14
**happen** 68:7
**happened** 11:12
13:3 14:20
31:24 54:18
55:14 67:6
85:13
**happens** 24:12
**hard** 15:1 18:6
18:14 19:6,10
40:16 41:12
69:2
**harder** 15:16
**hazard** 24:6,15
26:16 31:16,19
33:4,12 42:25
43:5 54:25 56:2
58:18,22,24
59:3 60:12 89:1
**hazardous**
24:24
**hazards** 50:15
51:9 56:25
58:23 61:25
62:18 63:9,24
64:16 65:4
70:25 71:14,14
71:21,24 72:16
73:6,21,23

**head** 52:15 55:3
**hear** 71:3
**help** 87:22
**helped** 11:3
15:24 16:1
**helpful** 12:10
16:18 23:3 27:5
29:9
**helps** 11:8,10
**henderson** 1:24
5:1 91:21
**hey** 7:18 10:20
21:7,15
**high** 40:23
43:21 44:1
45:14 72:16
**higher** 45:10
**highly** 40:20
53:17
**history** 76:9
86:19
**hit** 76:12
**holder** 75:7,13
**hotel** 83:21 87:8
**hour** 19:17
54:17 72:4
**hours** 70:24
71:17 80:12
**htc** 1:5
**human** 47:12
**hundred** 13:16
25:3 26:14
77:16,18,21
79:3,4

**hundreds** 79:14
**hydroplane** 24:21 25:2,6 36:11,13 37:11 37:17 41:6

**i**

**idea** 15:20 21:1 21:1,21 41:7,11 80:13
**identification** 56:3 59:21 60:12
**identified** 42:25
**imagine** 12:19
**immediately** 59:16
**important** 8:17 16:20 17:10 19:3 22:3 26:18 44:6 45:3,11 52:1,3,3 85:1,4 85:14,16,17
**inappropriate** 46:2
**inch** 30:5,6
**incident** 10:17 11:4,11,11 12:1 12:17 13:3,5 14:13,20 16:1 17:5 20:17 24:2 26:2 31:7,18 38:8 46:17 47:5 47:17,19,20 48:9,9,14,18 54:18,22 67:5

72:8 73:4 88:4,4 89:13
**incidents** 10:23
**include** 72:17
**including** 7:1 29:24,24 80:19
**incorrect** 36:3 61:25
**increasing** 51:3
**index** 3:1
**indicate** 46:16 55:25
**indicated** 29:22 35:15
**indicates** 70:22
**indication** 67:23 71:19 72:5 73:15
**industry** 40:22
**inform** 10:7,10
**information** 6:18 8:14 9:19 10:15 13:1,7,12 13:15 15:2,4 16:9,12,23,25 17:2 20:9,11,12 20:17 21:7,25 23:1,5 25:15 26:25 27:2,4,13 29:10,13,17 31:16 46:8 48:24 56:22 61:8 62:12 65:15 66:19 70:1 77:22,23

84:3 88:2 89:20
**informed** 6:25 13:21
**initial** 68:5
**injury** 22:13 46:17
**inside** 37:6
**inspect** 31:25 73:11,11 81:2
**inspected** 19:19 80:25
**inspection** 20:2 21:5,15,17 24:14 27:18 31:8,14,16 33:2 33:5 34:1 48:11 80:11,18 84:14 85:2
**inspections** 85:2
**install** 38:2
**installed** 39:7 81:20 82:24
**institute** 75:5,5
**instructed** 58:16 63:13
**instructions** 8:14
**insurance** 11:7 48:7
**integrates** 47:12
**interact** 51:13
**interactions** 21:18 87:23
**interested** 91:13

**interesting** 47:1 54:22 55:18 60:3
**interim** 32:2
**interrogatories** 59:7
**interview** 11:6 48:16
**investigate** 7:20
**investigations** 12:17
**invoice** 6:13 80:24
**invoiced** 80:13 80:23
**involved** 20:20
**issues** 22:1
**item** 29:16
**items** 12:22

**j**

**jack** 54:8,21,23 54:25 55:5,10 55:22
**january** 6:6,9 6:14 31:24
**job** 24:3,5 56:15 62:11 65:15 66:16 68:5,16 69:16
**johnson** 22:16

**k**

**keep** 8:12 36:15 58:17 63:13 65:10 84:23,24

**[keep - look]**

84:24 85:7,8,17

**keeping** 24:3
61:24 62:18
63:8,23 64:15
65:3

**kept** 37:6

**key** 21:25

**killed** 38:4

**kin** 91:12

**kind** 9:24 11:9
24:7 40:2 44:22
51:8 55:3 57:5
79:25 84:11

**kinds** 73:23

**kitchen** 40:20
40:25

**knew** 7:10 17:9
33:25 87:14,14

**know** 7:10,15
7:16,18,21 8:3
8:13,18,25
10:14,16,19
11:23 12:24,25
13:16,24 15:22
16:9,17 17:7
18:21 19:13
20:19 21:4
22:24 24:7 25:3
25:22 26:19
27:10,16 28:16
28:21 29:2,9
30:16,22 32:9
34:12 37:6
40:12,19 41:7,8
41:18 42:10,19

42:21 44:7,19
45:13 46:17
47:3 49:8,16,17
50:7 51:4,5,13
52:13 54:13
56:21 57:17,20
59:19,24 60:4
60:16,24 62:16
65:17,22 66:12
66:20,24 67:19
67:22 68:13
69:3,23 70:6,7
70:13,20 71:25
75:3 76:6,7,8
77:9,21 78:21
79:1,3,3,4,14,18
80:6,10 81:17
81:20 82:18,20
82:24 83:2
84:19 85:3 86:1
86:3,4,8 88:9,9
89:14

**knowledge**
40:14

**known** 24:6
88:13,18,25
89:14

**knows** 40:11
42:6,17 60:16

**kroger** 72:15

**l**

**l** 1:20

**language** 46:25

**laptop** 19:22

**latest** 82:4

**laws** 2:5

**leading** 2:10
48:17

**leaks** 59:15

**learn** 7:8 28:2

**learned** 88:1

**leather** 36:19,20

**left** 88:19

**legal** 8:23 14:14
20:19

**level** 37:6,14
38:4 50:11

**licensed** 74:17
91:15

**lie** 33:9

**likely** 15:10
26:16 37:16
46:16 52:5
54:20 55:8,13
67:5

**likewise** 71:9

**line** 93:11,14,17
93:20,23 94:1,4
94:7,10,13

**links** 85:5

**liquid** 22:12
32:18 33:20
54:7,21 59:16
88:14

**liquids** 54:12
72:17 73:12,16

**list** 10:18 12:17
13:10,11 34:25
48:23 66:3 77:7

83:18

**listed** 49:3

**lists** 75:3 84:10

**literally** 11:12
14:13,15 25:1
31:3 32:18 41:7
48:9 54:23
71:20

**litigation** 76:4
76:19

**little** 39:18

**live** 74:5 80:3

**llp** 4:8

**located** 87:8

**location** 11:13
14:16,20 32:22
47:5 48:15,17
62:11 81:2
88:10,15

**locations** 10:23
34:15 35:21

**log** 6:5 9:25
21:18 30:21

**logan** 1:7 4:6

**logs** 14:18

**long** 13:5 32:23
33:22 34:6 84:9
86:4

**longer** 12:2

**look** 7:24 11:22
19:12 20:25
21:4 27:21
38:10 47:4
48:25 49:2,4
50:10 51:12,17

52:4,12,15,15
52:16,16,17,17
52:17,18,20,21
53:4,16 58:21
62:6,23 71:14
71:19,21 73:6
83:24
**looked**  52:13
**looking**  17:3
50:2,13,16,20
50:23 51:6,9,24
52:5,9,25 53:3,6
53:7,8,10 55:4
56:14 58:23
62:20 70:25
71:13 72:4
73:24,25 74:13
77:11
**lookout**  58:17
63:14 73:20
**looks**  55:4
**lose**  8:16
**lost**  85:15
**lot**  8:16 10:22
10:22 11:3
17:14 25:23
41:4,16 64:3
72:24 73:3
78:10 85:9
**lots**  51:5
**loud**  83:23
**low**  50:21,25

**m**

**m**  90:19
**madam**  90:10
**made**  2:9 6:20
28:17 57:23,25
**mail**  8:9 86:17
87:14 90:17
92:10,19
**mails**  8:12,16
84:22,24 85:7,9
85:11,15,17,21
87:20,22
**main**  38:8 56:13
**maintained**  38:1
**maintaining**
29:23
**maintenance**
13:18 30:9,20
32:16 52:2
56:17 57:7
59:13
**make**  2:11 23:7
23:8 28:23
40:16 41:13
72:15 93:7
**makes**  40:10
**making**  8:3 21:2
73:16 93:8,8
**manager**  22:15
56:2 60:15,16
67:21
**managers**  56:11
56:15 62:12,13
65:15,17,19
68:8

**manual**  67:14
68:6
**manually**  92:8
**manuals**  14:2
68:12,13
**manufactured**
23:17
**manufacturer**
23:25 29:3
**march**  77:15
84:11
**marketed**  36:25
**marketplace**
44:10
**material**  13:18
14:3,18 27:12
35:16,25 37:19
38:14,21 39:3,9
41:9 42:20 43:6
43:8 44:14 46:3
47:24 52:3
**materials**  10:14
15:18
**matrix**  29:6
**matter**  5:23
20:24 23:4
32:12,23 34:4
34:21 38:25
40:3 43:11,12
43:14 71:22
79:23 80:7
87:24
**mattered**  33:14
33:17

**mcr**  1:5
**mean**  7:4 8:25
11:20 12:18
15:9 17:2 21:2
22:14 24:10
33:17 38:5
39:20 41:15
42:13 43:9 44:7
45:15 50:25
53:16 54:7
55:15,19 57:8,9
57:25 59:23
60:7 61:1,6 64:3
72:20 78:4
80:18 82:6
84:21
**meaning**  47:24
**means**  11:20
38:19 44:8
**meant**  25:6
**measure**  22:21
35:7 36:12 46:6
46:9
**measured**  24:16
31:9,13 32:14
35:13,20 36:18
**measurement**
46:12
**measurements**
33:8,11 46:12
**measuring**
23:10,21
**mechanical**  74:8
74:9

**medical** 46:18
46:21 47:17
49:16,21,25
**meet** 19:3,7 38:9
**meets** 24:17
**member** 24:18
**memory** 56:9
**mentioned** 12:5
19:6 26:13 66:2
69:25 84:25
**merchandise**
88:14
**mess** 8:4
**messages** 86:11
86:12
**met** 35:24 38:20
75:6
**method** 23:11
23:12 34:10
36:19 37:5
**methodologies**
66:7
**methodology**
36:23 66:4
**methods** 23:9
**million** 79:2,6
79:10,14
**minium** 44:2
**minutes** 44:13
72:4,7
**mobile** 4:10 5:2
91:4
**mode** 50:18
**modify** 17:7
28:2

**money** 78:21
**month** 6:2
**months** 77:25
84:12
**mop** 60:19,19
64:1,25 65:1,1
69:3,4,7 71:10
**mopping** 89:15
**morgan** 4:3,3
17:18,18 18:19
18:19 29:20,20
76:19,19 77:5,5
78:2,2,6,6,7,7
78:18,18,22,22
79:16,16 81:10
81:11
**morning** 49:14
86:17 87:3
**mount** 50:13
51:3
**mouth** 77:3
**move** 55:24
**moved** 33:22
34:11 54:24
**moves** 60:20
**moving** 58:18
63:15 73:14
**multiple** 58:15
62:3 63:12 64:1
71:9 80:2
**myers** 81:16

**n**

**n** 1:20 4:1
**name** 91:18

**national** 30:4
72:11 75:4
**nationwide**
39:25 68:2
**nature** 12:7
13:11 18:24
39:22 68:7
**naught** 76:13
**necessarily**
52:18 83:24
**necessary** 2:8
93:9
**need** 7:5,19 8:21
8:24 9:19 10:13
10:21 11:2,20
13:6 16:11 24:7
25:2 33:2,6 39:9
48:8 49:5 67:20
75:6 90:13
**needed** 7:22 9:1
9:4 10:8,11
11:17 15:14
16:5 20:4,5
48:18 71:10
**needs** 13:14
**neither** 91:11
**never** 7:12
13:19 16:10,13
19:10 20:4
26:11 39:3 45:5
53:16 69:9 73:6
73:18 82:20,23
86:9
**new** 88:2

**nice** 13:2
**normally** 6:1,12
7:3,4,18 8:1
16:8 20:9,10
25:16,18 31:3
51:11 63:2
69:11,12,16
72:3 80:16
**north** 4:9
**northern** 1:2
75:8
**notarized** 92:10
**notary** 94:23
**note** 7:17 11:23
**noted** 54:1 93:4
93:5
**notes** 5:24 6:4
6:15 7:17,25
8:14,16,18,22
9:20,23 11:23
14:9 19:12,15
20:8,25 21:4,10
26:9 48:25 49:4
49:6,17 56:8
57:4,14,23,25
58:1,7,12,19
65:9 71:19
84:12,14 87:20
87:22
**nothing's** 9:4
**notice** 2:15 55:6
58:6 70:10
83:10 87:11
**noting** 92:7

**november** 6:10
6:13
**number** 3:2
6:12,15 21:3,9
53:20 57:10,18
68:2 78:11,19
91:18
**numbered**
27:23,23

**o**

**o** 1:20
**o'clock** 21:16,16
**oath** 68:11
**object** 88:23
89:3,17,25
**objection** 88:5
**objections** 2:8
2:11 59:5
**observed** 59:25
**obtained** 20:14
**obviously** 30:24
45:9 53:22
**occurred** 54:22
**offered** 2:12
**office** 85:11
87:24
**offices** 92:3,10
**official** 15:23
**oh** 17:12 32:4
37:25 52:11
59:10 78:20
82:1
**ohio** 74:5 80:4
**oils** 73:8

**oily** 39:13
**ojt** 56:10,21
60:9 61:2,5
68:18
**okay** 6:8 16:15
18:5 19:14,19
20:22 21:19
24:9 26:18,24
28:12,16 33:13
34:21 39:19
42:23 47:8,16
49:7 51:8 58:8
58:14 65:12
67:9 69:19 70:5
78:14 80:6,13
82:10 90:13
**once** 14:11 33:2
92:10
**ones** 86:16
**open** 62:19
70:24 71:17
**operating** 69:12
69:14
**operation** 13:4
13:17
**operations**
14:18
**opine** 49:22
70:2
**opinion** 5:25
14:25 15:1 17:1
17:3,5,6,7 18:15
18:16,17,18
19:5,8,9,21 21:8
26:4 27:22 28:5

28:6,12,14,24
33:4,8,15 34:7
34:22 36:4
39:12 40:2 43:3
45:18,19 46:15
47:13,21 49:3,3
49:25 50:8,9
52:8,25 53:19
53:20 55:24
59:4 62:24,25
64:7,21 67:2
75:1 78:4 80:24
84:13
**opinions** 11:1
18:7 27:23,24
28:4 47:6 48:2
57:19 62:8 84:9
84:16,16
**opposed** 66:17
68:15 76:24
**opposing** 86:12
**oral** 5:7
**order** 10:12,24
11:18 12:9
13:10 90:12
**ordered** 90:11
**ordering** 92:13
**organization**
18:10
**original** 9:17
34:16 92:13,15
**osha** 59:10 61:9
61:13,15
**outcome** 91:13

**outdated** 84:11
**outlined** 56:19
**outside** 79:16
**own** 7:1 35:24
67:22
**owner** 76:1

**p**

**p** 1:20 4:1,1
74:11,12
**page** 3:2 22:7,10
27:21,22 35:15
38:10 42:23
53:20 62:9 64:8
64:16 65:12
92:18 93:11,14
93:17,20,23
94:1,4,7,10,13
**pages** 63:18
93:9
**paid** 78:22
**pallet** 54:8,21
54:23,25 55:5
55:10,22 88:13
**paper** 69:8,11
87:17
**paragraph**
28:10
**parent** 60:1
**parked** 54:23
**parkway** 92:21
**part** 12:13
20:18 24:14
28:7 36:4 46:15
47:17 58:5 63:7
64:6 73:10

**particular** 9:14
11:1 23:6 27:13
29:3,7 34:5
40:24 46:1
47:23 72:25
82:19,25
**particularly**
15:9 51:20
72:16
**parties** 1:22
2:11 91:12
92:13
**parts** 28:6 73:8
**past** 44:25
**paste** 84:12
**path** 51:7 88:19
**pathway** 51:11
**pay** 7:6
**pdf** 19:21 92:7
**peaks** 55:3
**pebbles** 51:5
**pedestrian**
42:25 71:23
**pedestrians**
54:13
**pending** 6:21
**pensacola** 1:3
4:4 6:22
**people** 40:15
41:7,16,21,22
50:14 51:24
52:4 59:25
60:25 69:2,17
72:21 73:14

**perceive** 50:12
50:22
**percent** 13:16
25:4 76:13 77:1
78:8
**percentage**
76:22
**perfect** 45:16
60:17
**period** 81:4 86:7
**person** 11:7
13:4 40:11,12
49:21 54:16
71:20
**person's** 25:19
50:20
**perspective** 21:6
**phone** 11:6,6
**phonecall** 77:1
**photos** 84:13
**phrase** 61:8
**physical** 71:12
**piece** 26:2 69:8
69:11 87:17
**place** 18:7 34:20
65:23 69:7
**placed** 88:14
**placement**
88:19
**places** 62:3
**plaintiff** 1:8 4:6
76:23 77:2
90:11
**plaintiff's** 5:22
8:10 9:17 10:7

10:11 11:17
15:14 16:4 20:4
20:23 21:11,20
59:6 83:6 84:3
84:22 86:12
87:23 88:10
**plan** 78:14
**plastic** 32:18
**play** 20:16
**please** 90:9,15
90:18 92:10,18
93:9,9
**point** 25:22
39:16 78:5
**points** 32:14
34:10,11
**policies** 9:22
10:15 11:9
13:16 14:1,5,18
15:17 20:13
56:1,14 57:7
61:9,23 62:1,4
62:17,21 63:1,3
63:7,22 64:4,7,9
64:14 65:3 66:4
66:6,9 67:1,3,7
67:10,13 69:13
69:14 70:19
89:9
**policy** 13:18
25:15 51:22
56:18 58:20,24
59:1,2 62:16
64:1 67:4 69:6
70:7

**polished** 30:8
45:15
**polymer** 36:8
**porcelain** 23:17
**position** 65:25
**possible** 55:12
**pot** 49:21
**potential** 39:5
43:21 44:2,3
47:19 58:18
63:14 72:17
**potentially**
24:23
**practical** 75:10
**precise** 32:10
**precluded** 82:13
**premises** 61:24
62:18 63:8,23
64:15 65:3
**prepare** 10:12
10:25 11:18
12:6,10 13:10
15:15,17 16:7
70:14
**prepared** 18:1
83:5
**preparing** 12:11
15:19
**prerequisites**
75:16
**pretty** 16:10,13
30:10 34:19
81:6,13 82:22
84:6,15

**primarily** 76:3 76:4
**principle** 60:9
**print** 92:8
**prior** 2:13 11:14 11:16 13:5 53:23 79:8
**probability** 73:7
**probably** 31:10 58:19 61:1 80:19 81:8
**problem** 24:18 24:25 36:9,17 37:8
**problems** 36:14
**procedure** 5:4 64:2 93:6
**procedures** 9:23 10:15 11:10 13:17 14:1,6,18 15:18 20:13 30:21 32:17 56:1,14,16 57:7 59:14,20 61:9 61:23 62:2,4,17 62:21 63:1,3,8 63:23 64:4,8,9 64:14,22 65:3 65:22 66:4,6,9 67:2,3,7,11,13 69:12,14 89:9
**proceedings** 5:8 91:6,10
**process** 17:20 20:18,21 59:21

60:21 61:3 68:19,21 69:17 69:19,22,23 70:1,2 71:14
**processes** 60:11
**product** 22:15 73:1
**production** 20:14 92:20
**program** 56:21 56:24
**programs** 56:2
**properly** 34:20
**protect** 24:1
**protocol** 89:16
**proved** 89:22
**provide** 16:12 36:21 77:23
**provided** 5:3 18:8 19:4 20:18 23:1 54:15 55:23 56:18 58:9 59:2 61:16 62:12,21 63:4 64:23 65:16 66:13,15,16,18 69:18,25 83:25 84:2
**provides** 13:7 44:2
**public** 41:11 94:23
**published** 15:23 56:1,10,14 63:3 64:7,9,22 66:3

67:1,3
**puddle** 24:12 25:7,9,23
**puddles** 26:1
**pull** 55:3 57:14 65:9
**pulled** 55:16
**pump** 60:7,8
**pumping** 60:5,6
**purported** 17:15
**purposes** 22:4
**pursuant** 93:6
**put** 8:5,18 18:12 21:10 23:17 24:1 32:19 34:14 38:2 80:4 84:16
**putting** 48:2 51:6

**q**

**qualifications** 74:25 75:3
**qualified** 46:20
**quarter** 25:18 26:13,14 79:2 79:10
**question** 16:3,4 17:13 31:21,22 33:14 42:10,22 44:12,22,22 53:13 65:7,10 65:18,21 67:10 71:7 74:2

**questions** 2:9,10 68:17 70:15 84:6 86:23 87:4 90:3
**quick** 83:24
**quite** 88:2
**quote** 22:10 70:5,23 71:16

**r**

**r** 4:1 90:19 91:1
**racquet** 72:1
**racquets** 71:25
**rather** 24:12
**read** 44:13 75:1 83:14,15,22,23 90:8,9,11,14 92:6 93:2
**reading** 2:2 43:25 63:17
**really** 7:6,20 13:2,15 23:7 24:6 28:6,13 31:21 32:23 33:14 34:4 40:3 40:3 42:12 59:12 65:9,22
**reapplying** 31:4
**reason** 35:10 41:25 45:1 48:13 52:2 85:9 89:14 93:13,16 93:19,22 94:3,6 94:9,12,15
**reasonable** 24:17 35:16,25

36:21 37:13,19
38:21 39:15,16
39:21 44:4,7,10
44:14,19 45:1
45:16 61:3,11
63:1 66:12
67:20,23 68:19
68:23 69:1
72:13,19
**reasonably**
24:24 37:8
51:23
**reasons**  24:22
25:14 51:21
72:6 93:8
**recall**  7:3,12,22
9:14 18:20 20:7
21:19 26:12
50:4 55:2 58:14
79:21 80:25
82:19 83:8
87:17
**receive**  27:2
**received**  17:5
87:11
**recent**  86:16
**recently**  30:7,12
**recollection**  8:7
16:16
**recommended**
51:17
**record**  8:19,22
21:16 22:5
49:18 85:1

**recover**  85:22
86:1
**refer**  50:9
**reference**  12:16
43:17
**referencing**
10:2
**referred**  81:22
84:1
**referring**  61:14
71:11
**regard**  14:5
17:24 20:12
27:13 29:7
35:25 46:23
57:11 59:2
70:19
**regarding**  20:23
87:21,23,24
**regardless**
23:24 42:24
**relate**  31:17
**related**  13:17
20:12,17 47:15
61:9,10 71:23
73:1
**relates**  36:6
**relating**  2:5
**relatively**  6:10
**remember**  7:21
8:1 9:3,21 11:19
11:21,25 12:3
13:22 15:9 16:8
45:6 49:10,11
49:15,18 57:5

62:24 74:4
76:10 87:13
**remotely**  4:5,11
5:6
**remove**  33:10
**rental**  76:16
**rep**  16:14 62:10
**rep's**  89:8,22
**report**  6:23 7:1
7:19,23 8:1,2,7
8:11,21,24 9:1,6
9:8,11,19 10:2
10:12,18,25
11:18 12:10,11
13:11 14:4
15:15,17,20
16:7,21,23
17:11 22:6,8
27:22 29:22
34:25 35:16
37:18 38:11
42:23 43:17
44:13,20 46:15
48:24 54:1
57:10 61:22
63:21 64:13,16
70:22 80:11,18
81:23 83:5,6
84:17 89:23
**reporter**  5:2,13
5:16 90:10,13
90:23 91:17
**reporting**  91:16
**reports**  12:6
18:1,23

**representative**
15:13 16:6 20:6
56:7 65:13
**request**  20:14
58:6
**requested**  18:19
18:21 84:20
92:6
**requests**  21:7
**required**  45:23
46:11
**requires**  34:10
36:23
**research**  47:11
50:10 80:11
**reserve**  17:7
21:23 22:4 28:2
**resistance**  30:25
32:2,6 36:21
37:4 46:7,8
**resistant**  23:14
37:1
**respect**  28:8
65:23
**respectfully**
16:2
**respective**  1:22
**responsibility**
92:6
**responsible**
58:21 68:9
**rest**  25:20
**restaurant**  36:1
**restricted**  82:23

**result** 31:7,11
**retail** 12:23
14:17,19 15:10
22:18,18 29:24
30:4 35:17 36:1
37:19 38:22
39:15 44:15,23
45:20,23 46:2
50:14,17,19,22
51:1,23 52:1
63:2 72:14,23
73:7,17
**retailer** 30:11
**retailers** 30:13
39:24 66:11
68:2
**retained** 6:2,7
15:4 76:23,23
78:6,9
**retainer** 80:16
80:23
**returned** 92:12
92:15
**review** 5:22
26:5 56:5 57:13
59:8 62:2 68:5
68:13 69:10
70:10 79:23
88:3 92:7
**reviewed** 29:5
48:20 49:8
57:17,19 79:7
84:5
**reviewing** 57:21
78:23

**right** 10:1,1,3
12:7,9 14:10,11
15:12 16:18
17:7,24 19:20
19:23 21:22,24
22:5,10 28:2,21
31:1,20 32:5,7
34:2,23 35:12
35:15,18 36:1
37:18,20 38:10
38:19 39:6 40:6
40:11,15 41:1
41:15 43:3,18
44:18 46:14,18
46:23 47:2,9
49:12 51:20
54:10 55:16
56:5 57:16 60:2
60:23 63:9,19
69:10,24 73:21
74:15 75:15
76:6 77:8,24
83:13,17,22
84:5 86:7 87:3
88:1 89:5,12,19
90:22
**risk** 50:11,21,25
51:3
**riverbed** 51:4
**road** 91:22
**room** 83:21 87:8
**rough** 40:23
45:14
**roughly** 80:16

**roughness**
31:10 33:7,11
34:18 36:5
37:15 38:6
43:15,17 44:6
45:2,3,7,10
**rounding** 77:19
**rsd** 43:18,23
45:22 46:1
**rule** 93:6,7
**rules** 2:5 5:4
59:9 62:17 70:8

**s**

**s** 1:20,20 4:1
90:19,19
**safe** 60:7 61:24
62:18 63:8,23
64:15 65:4
**safety** 37:14
38:5 51:25
56:17 59:9,11
61:16 62:16,19
70:8,23 71:17
71:20,24 72:2,9
72:9,12 75:22
**saith** 90:25
**saran** 32:19
**save** 30:8 86:19
**saw** 33:2
**saying** 7:17 13:6
17:14 19:2
34:17 38:24
44:18 55:12
59:20 63:6,25
63:25 64:11,24

66:15,16 69:5
82:2
**says** 23:12,20
37:2,18 38:13
45:25 59:15
63:21 64:13,16
**sc** 22:15
**schedule** 72:3
79:17,19
**scheduled** 85:2
87:15
**scheduling**
85:18
**school** 74:14
**scott** 4:8
**screen** 83:12
**sdof** 35:2
**seal** 92:12
**search** 50:18
**sec** 34:13
**second** 28:10,12
36:4 46:14
53:19 55:24
68:18
**sections** 63:5
**security** 10:22
11:8,18,24 12:1
12:2,7 15:11
33:3 54:11
**see** 9:20 11:23
13:2,3,4,25 14:1
18:20 20:4,8
21:5 26:7 33:6
34:13 48:9,23
51:22 54:12,13

54:17,18,24
55:1,19 56:3
57:2,15 58:24
59:3 64:24
69:22 70:8 71:1
72:8 73:4 77:10
82:21 83:12,13
83:14,18 86:9
86:20
**seeing** 72:7
**seek** 16:20
17:10
**seem** 55:8
**seemed** 54:8
**seemingly** 59:19
**seems** 28:6
60:11 77:1
**seen** 24:23 58:8
89:12
**selection** 46:3
47:24 52:3
**sell** 71:25
**send** 8:5 92:13
**sense** 78:1
**sensor** 36:19
**sent** 8:6 90:14
**sentence** 62:14
**sequence** 6:1
**services** 76:5
**set** 8:11 12:1
37:22 38:20
59:6 72:3
**setups** 21:5
**seven** 21:16
76:10

**several** 56:13
64:25
**share** 83:12
84:9
**sheets** 27:12
29:5
**shelves** 71:22
**shift** 60:14,16
**shiny** 24:4
**shoe** 36:7 41:6
**shoes** 24:24
36:20 41:4
**shopping** 50:18
88:19
**show** 56:23
**showing** 37:15
39:7
**shows** 50:10
55:18 60:19
**shuffling** 26:3
**side** 18:8 41:9
41:10 46:9
**sidewalk** 41:19
51:10
**sign** 90:14,22,22
92:6
**signature** 2:2
91:21 92:2,16
94:18
**signed** 92:10,12
92:15
**simply** 18:24
**single** 50:13
51:12 52:18

**sit** 39:17 49:7
57:16
**site** 84:14
**sitting** 10:1
19:13 21:21
28:1 57:22
58:12 74:4
78:24 79:1
80:15 82:1
83:21 86:10
**six** 21:15 76:10
80:20 85:15
**size** 25:18 26:13
26:14,19
**slide** 26:17
**slip** 12:19 23:14
24:15 25:17
30:25 32:2,6
36:6,21,25 37:4
39:12 41:16
43:21 44:1,2
46:7,8 51:14,18
52:7 56:2 59:13
61:24 62:18
63:9,23 64:15
65:4 71:21,24
72:17
**slipped** 22:13
23:24 26:23
32:10 54:10
**slippery** 36:10
36:16 40:6,10
40:16 41:13,18
41:20,22 42:3,9
42:16 45:17

**slipping** 41:17
**slips** 31:12
**slog** 78:16
**slow** 44:2
**smaller** 25:18
**smoked** 60:5
**smoking** 60:6
**smooth** 24:19
24:20 25:5
36:11 37:11
41:5,22 45:17
46:11
**smoothness**
46:10,12
**software** 8:15
84:13
**soil** 39:12
**soiled** 40:20
**sole** 76:1
**somebody** 8:15
37:16 48:7
68:15
**sons** 1:10 4:12
**soon** 13:24 15:4
78:15
**sorry** 26:1 46:13
71:3
**sort** 47:16 55:2
66:14
**sound** 25:25
**sounds** 10:4
22:3 83:19
**source** 55:8
**south** 81:14,15

**southbridge**
  92:21
**southeast**  92:18
**speak**  20:23
  48:1
**spec**  29:17
**special**  79:15
**specific**  8:8 9:25
  21:8 28:21 31:8
  32:22
**specifically**
  10:20 23:12,20
  37:2 38:6 44:23
  59:15
**specification**
  10:15 39:9
**specifies**  23:25
**specify**  23:16
**specifying**  29:23
**spent**  57:20 80:7
**spill**  25:15 51:22
  51:25 56:18
  59:13 60:11,14
  60:15,16,19,25
  61:10,12 67:4
  73:1
**spilled**  55:16
  59:16
**spills**  68:6
**spot**  34:5,22
  54:10 55:17
**sprayed**  73:13
**spraying**  73:13
**spreadsheet**
  77:8 78:13,25

84:18
**squished**  25:19
**stack**  85:12
**stairs**  12:20
**standard**  12:14
  12:16 23:15
  24:18 35:24
  37:5,22 38:6,9
  38:20,21,24
  39:2,8,14 42:24
  45:22,25 46:4,6
  46:12,13 61:11
  63:2 67:20,23
  68:23 69:1
  72:11,13,20
  74:23,24 75:2
  83:3 84:6
**standards**  22:19
  22:20,20 24:17
  36:22 46:3
  47:11 75:9
  81:22,24 89:15
**standing**  23:20
  24:8,10 25:5,7
  25:10,12 37:7
  37:13 38:1,3
  39:10,14,16
  40:4 42:1,25
  43:4,11 45:20
**starnes**  4:8
**start**  51:9 77:13
**started**  26:3
  30:7 60:6 76:6
**state**  74:18 91:3

**stated**  27:23
  62:10 65:14
**statement**  53:5
  73:22 93:8
**states**  1:1 23:18
  38:13,24 93:7
**static**  23:11 35:1
  35:7 36:18,24
  46:5,6
**stay**  42:2 86:4,6
**stays**  25:21
**step**  22:11 50:14
  51:4,12,24
  52:14,18 53:7
**stepped**  22:12
  52:14
**steps**  50:11,16
  52:6 53:10
  54:14
**stevens**  3:3 4:9
  5:17,20 86:23
  88:5,23 89:3,17
  89:25 90:5
**sticking**  9:4
  36:9
**stipulated**  1:21
  2:1,7,14
**stipulation**  5:5
**stipulations**
  5:16
**stock**  62:15 70:6
**stocking**  62:16
  70:7,15
**store**  12:19
  19:19 20:5

32:14,24 33:15
  34:6 35:17 36:1
  37:19 38:22
  42:15 44:15,23
  45:23 48:10
  50:22 51:1
  58:15,18 62:11
  62:15 63:2,12
  63:15 65:14
  67:21 69:13,15
  70:6,16,23 71:9
  71:12,16,21
  72:12 73:9,10
  73:11,16,17
  81:17 82:25
**stores**  29:24
  42:15 46:2
  62:20 67:24
  81:1,3,4
**street**  4:4,10
**stricken**  82:15
**strike**  10:9
  11:14 82:10
**stripped**  30:17
  31:23
**stripping**  30:7
  30:24 32:1
**structure**  47:13
**stuff**  10:17
  12:18 14:2,14
  14:21 16:10
  20:20 28:3
  42:20 47:7
  73:14 76:17
  80:21 81:7

82:19,22 84:17
84:19 85:19
86:18 87:18
**submit** 80:20
**subscribed**
94:19
**substance** 51:20
93:7
**substrate** 28:18
28:19
**substratum**
75:25 76:1,3
**substratumgro...**
90:19
**sufficient** 69:20
**suggest** 83:7
**suite** 4:10 92:21
**sum** 78:25
**super** 40:23,23
**suppose** 69:6,6
**supposed** 19:4
58:24 68:8,14
**sure** 6:3 16:10
16:13 19:1 25:4
33:19,24 41:17
72:15 73:16
81:6 82:22 86:6
86:22
**surface** 24:2
30:25 31:4,5,10
32:13 33:7,11
34:18 36:5
37:15,17 38:5
40:16 41:12
43:15,16 44:6

45:3,6,10,15
**surprise** 79:11
**surprised** 41:21
**surveillance**
10:8,11,14 11:2
88:3 89:13
**sustained** 22:13
**sweep** 56:17
71:8,10,11,12
71:20,24 72:3,9
72:10,12
**sweeps** 52:1
62:19 70:24
71:17
**sworn** 5:12
15:12 68:10
94:19
**system** 8:23
19:18 20:19

**t**

**t** 1:20,20 90:19
90:19 91:1,1
**table** 34:14
**take** 8:15,17
58:1 83:24
**taken** 1:23 91:7
**talk** 28:5 43:16
48:8 53:19
**talked** 36:22
57:1
**talking** 8:15
33:24 61:13
71:12 78:3 89:6
**talks** 38:11

**target** 30:10
72:15
**target's** 22:17
**task** 66:13
**tasks** 56:16
**teach** 60:1,25
**teaching** 60:13
60:15
**tear** 32:6
**technical** 27:8
**technique** 31:3
**tell** 6:9 7:5
11:17 15:14
16:5 48:20
55:13,14 59:18
68:12 83:25
84:4
**telling** 42:18
69:13
**tells** 35:23
**ten** 18:3 43:20
43:23 44:1
66:11,11 77:5
79:5
**tennis** 71:25
72:1
**terms** 34:25
79:16
**test** 23:11,12
32:9 34:10,11
34:12,16 35:21
36:19,23 37:2,5
37:15,24 75:10
**testified** 5:13
26:7 43:12

44:25 45:5
49:13 50:1,5
52:24 57:11,12
61:23 62:3 63:7
63:11,22 64:14
64:19 70:23
71:8,16 77:4
78:2 87:5,19
**testifies** 53:14
**testify** 17:14
40:5 46:20 61:4
65:2,7 70:11,18
77:6 78:4 87:23
**testifying** 42:13
82:13
**testimony** 15:12
15:24 20:5 22:1
22:4 23:23
32:24 39:20
41:23,25 42:12
42:13 49:8 53:2
56:6,20 57:2
58:14 63:6
68:10,10 77:7
77:12 79:8
82:15,23 84:10
87:9 93:2,7
**testing** 30:19
**tests** 75:10
**texas** 75:8
**text** 86:11,12,19
**texts** 84:24
**thank** 86:24,25
90:6

**[thereto - twenty]** Page 117

**thereto** 2:13
**thing** 8:20 13:14
  26:15 53:2 59:5
  60:3 69:15
  76:11 78:17
  80:5 87:14
**things** 10:18
  13:10,11 20:13
  56:13 60:10
  64:11 67:19,22
  68:6,15 71:21
  72:4,24 75:3,3
  80:23 82:20
**think** 6:23 8:19
  10:13,20 14:6
  23:3 27:5 30:20
  41:19,20 42:7
  42:17 49:1,19
  50:6,8,15 51:2,7
  52:6 54:4 56:11
  57:5 58:19 62:7
  70:21 71:25
  75:9 76:13
  77:16,19 78:7
  79:9,12,13
  80:22 81:15
  84:25 85:4,14
**thinks** 41:20
**thought** 46:25
  79:21 85:16
**thousand** 79:4,5
  80:17,20
**thousands**
  79:14

**three** 8:3 32:14
  34:10,15 35:21
  49:13 50:10,16
  52:5,15 53:10
  56:12,13 75:8
  75:19 80:17
**tile** 23:17 28:20
  29:3,7,25 30:3
  30:14 32:10
  36:9 37:5 39:6
  42:14 81:20
  82:24
**tiles** 41:21
**time** 2:12,12
  6:25 9:24 14:16
  20:2 21:11,17
  57:6,20 61:4
  62:19 70:24
  71:17 75:11
  79:24 80:6 81:1
  86:7 90:4 92:15
**timeframe**
  11:11,22,25
**times** 10:22 12:6
  12:6 20:22
  58:15 62:20
  63:12 64:1,25
  70:25 71:9
**timings** 18:9
**tire** 24:21 25:2
**title** 75:23
**today** 6:16 8:4,5
  10:5 19:16 28:3
  49:7 57:16
  58:11 80:14

83:20 86:24
  87:9
**today's** 87:12
**together** 9:7
  45:7,9 48:2
**tokens** 49:13
**told** 7:13,18,22
  13:23,24 16:10
  18:11 20:4,10
  21:15 67:24
  69:4,5,6,7 70:3
**took** 11:23
  22:11 75:5
**top** 24:1 36:8
  66:11,11
**topics** 70:11,13
**total** 77:4
**totally** 24:24
  78:10
**toxicologist**
  49:23
**traditional**
  30:10
**traditionally**
  30:5
**trained** 62:13
  65:17,19 67:12
**training** 14:2
  15:18 56:2,10
  56:16,25 59:20
  59:22 61:10
  62:10 64:10
  65:14,22 66:1,3
  66:14,15,16,17
  67:4 68:16,19

69:16 76:16
**transcribed**
  91:7
**transcript** 48:6
  57:24 58:1,2
  89:8,22 90:8
  91:9 92:7,13,15
  93:2
**transcription**
  91:8
**travel** 80:4,5,19
**traveling** 87:6
**tread** 24:25
**treads** 41:5,6
**trial** 2:12
**tried** 85:24
**trip** 51:9,14
  52:6 61:24
  62:18 63:9,24
  64:15 65:4
  71:21,24 80:2
**true** 15:7 91:9
**try** 8:17 20:16
  22:5 30:8 80:1
  83:15 85:17
**trying** 40:18
  41:14
**tucked** 69:9
**turn** 25:23
  46:14
**twelve** 77:25
  84:11
**twenty** 18:4
  44:2 65:6

twice 89:2
twist 40:18
two 24:14 27:23
28:6 34:25 36:7
68:17 79:4
80:23
type 27:10 30:3
32:13 42:8 76:4
types 73:20
typically 13:9
14:22 53:9

**u**

u 1:20 90:19,19
uh 5:25,25 8:13
8:19 10:13 11:5
11:20 12:23
15:16 16:8,24
20:1,7 21:5,14
21:14 22:19
23:15,22 24:11
25:9,21 26:10
28:23 29:14,20
32:16 36:10
37:10,16 38:6
41:6 42:21
43:25 46:4,8
47:4 48:5,6,14
49:15 50:14
51:22 52:2,13
53:2 54:16,19
58:20,25 60:4
60:10 61:7 62:9
64:10,24 66:10
66:24 67:18,19
69:2,15 73:1

74:23 75:2 76:6
76:8,15 78:8
80:3,15,17
81:12,12 82:1,1
82:9 89:11
um 7:15,20 8:6
8:21 9:9 11:3
12:25 14:10
19:6 20:17 24:2
25:6,24 60:24
62:6 72:14 73:4
78:9 82:8
unclean 39:10
under 68:11
underneath
25:20 43:7,9
undersigned
93:2
understand
11:10 14:12,12
14:16,19 15:22
16:1 17:13,21
18:5 27:8 44:11
71:7
understanding
15:17 16:19
59:22 74:13
understood
48:15,16
unfortunately
16:24 57:3
united 1:1 23:18
university 75:8
unreasonable
73:6,17

unrelated 24:2
unsafe 40:5
41:25
unusual 50:19
57:5
update 78:12
use 6:1 8:2
22:21 25:10
30:14 40:24
44:21 82:9,21
85:11 93:9
used 13:19
23:15,16 30:3
30:11 31:3 35:2
37:5 39:4 46:6
51:11 76:17
82:3 84:8,15
useful 13:7
21:14 33:5
uses 36:19
using 37:15 91:8
usual 5:16
usually 50:23
utilize 42:16

**v**

v 1:9
value 23:19,21
36:24 37:10
38:7,14,17 39:1
42:24 43:18,23
45:22 46:1
values 25:8
34:13
various 62:4

vct 29:1,15,17
30:10
vegetable 73:12
vegetables
73:13
vendor 53:23
vendors 62:15
62:16 70:6,7,15
verbal 66:6 67:8
67:11,25 70:3
verbalized 70:3
verbally 64:11
69:17
veritext 92:10
92:20
veritext.com
92:18
version 82:8
90:12
versions 82:4
versus 10:2
26:14 27:17
57:11 85:19
video 9:21 10:8
10:12,14 11:2,8
11:18,24 12:1,2
12:7,24 13:1,22
13:23,24,25
15:7,8 16:18
17:4,10,10 20:5
33:3 48:5,14
54:16,19,25
55:8,11,17,20
55:23 60:18
72:7 73:3 88:3,8

88:21,21 89:13
89:21
**videos**  10:16,22
14:19 54:11
**view**  18:23 19:2
28:12 55:7,20
**viewing**  88:8,21
89:21
**vinyl**  22:11
28:20 29:25
**virtually**  42:5
**vision**  47:14
**voicemails**
84:23

**w**

**waive**  90:8
**waived**  2:3,16
**walgreens**  22:16
**walk**  52:4,12
53:8 71:13,20
**walked**  33:5
38:14,25
**walking**  28:25
50:3,20,21 51:4
51:18 52:10,21
52:25 53:3,5,11
53:17 89:1
**walks**  60:20
**walkway**  12:15
12:21 23:20
27:7,9 28:7,9
37:6 46:16,24
47:11,25 50:12
51:15 74:20
75:2,7,13,22,22

**walmart**  22:16
29:25 30:4,6,6
30:10 72:15
**want**  13:10,25
14:1 46:10,14
53:19 55:24
65:10 66:25
83:17,23 90:14
90:16
**wanted**  51:22
**wants**  10:21
**water**  4:9 23:13
23:14,20,23
24:5,8,10,19
25:5,7,10,13
26:3 31:11,15
31:18 33:3,12
33:18 34:2,5,6
34:20 37:8,9,13
38:1,3,4 39:5,10
39:14,17,21
40:4,9,15 41:12
42:1,1,9,14,25
43:4,7,9,11 44:3
45:21 54:13
55:9,21 61:1
73:2
**waters**  73:8
**waxed**  30:17
31:23
**waxing**  30:24
32:1
**way**  13:5 18:12
23:25 44:25
54:5 57:9 60:7

61:2 67:22
70:20 84:7
**ways**  67:19
**wear**  32:5 41:3
**website**  85:6
**week**  81:8,9
**weeks**  8:4
**went**  82:6 83:3
**west**  4:4
**wet**  35:4,12
36:10,16 37:4
38:14,25 41:19
41:20 42:8
45:17 46:8
**white**  54:12
**witness**  2:3 5:7
5:12 17:15 76:7
76:9,12,14 77:7
77:14 86:25
88:24 89:4,18
90:1,9,10,18
91:10 92:18
**wood**  56:7 57:1
61:22 62:9,14
65:13,17 70:5
70:22
**wood's**  58:14
**word**  25:9 36:13
77:2
**words**  62:23
82:21
**work**  40:12 45:7
45:9 68:1 72:21
76:14,19 81:14
85:20 87:6

**worked**  16:11
79:25
**working**  7:4
18:10 66:10
**workplace**  59:8
59:11 61:16
**world**  71:23
**wow**  41:18
**wrap**  32:20
**write**  8:3
**written**  59:2
60:10 63:3 64:4
64:7 66:3,9,17
67:11,14 68:22
69:20 75:10
84:10 87:20
89:23
**wrong**  32:17
41:24 63:21
78:10 79:4
**wrote**  18:17
57:15 58:19

**y**

**y'all**  76:3
**yeah**  10:24 14:5
14:25 15:10
25:2 33:24
34:15 37:21
38:12 41:2
42:21 47:8 50:8
52:20 55:1,7,19
57:3,8,14 58:5
58:19 59:10,17
60:3 61:6 63:16
64:18 66:18

71:5 76:21
77:11,19 78:5,5
78:16 79:7 81:6
81:12 83:16
86:14 87:10
**year**   6:2 27:19
30:17 31:24
77:15,17 79:9
**years**   65:6 76:10
77:5 82:4

**z**

**zoom**   1:24 4:5
4:11 5:6 86:17

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

(F) Certification and filing by officer; exhibits;
copies; notice of filing.

(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.